Opinion issued August 18, 2016



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00846-CV

————————————

**PREDATOR DOWNHOLE INC. AND NANCY VERMEULEN, Appellants**

**V.**

**FLOTEK INDUSTRIES, INC., Appellee**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-64649**

---

## O P I N I O N

In this interlocutory appeal, Predator Downhole, Inc. [hereafter, "Predator"], and Nancy Vermeulen [hereafter, "Nancy"] appeal the trial court's order denying their special appearances in a suit by Flotek Industries, Inc. [hereafter, "Flotek"]. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West Supp. 2012).

Predator and Nancy contend that they are not subject to personal jurisdiction in Texas because they do not have the requisite minimum contacts with Texas that would support jurisdiction and because the trial court's exercise of jurisdiction would violate traditional notions of fair play and justice. We reverse.

## BACKGROUND

### The Vermeulens Work for Flotek

Flotek is an energy services company specializing in downhole oilfield tools. Flotek hired Chris Vermeulen [hereafter, "Chris"], Nancy's husband, as an Operations Coordinator in March 2008. Chris's employment was governed by a letter agreement and a Bonus Agreement, which required him to disclose and convey to Flotek any inventions or ideas that he developed during his employment and to preserve the confidentiality of Flotek's confidential information. The bonus agreement also prohibited him from competing with Flotek "anywhere in North America or in any other geographical area in or with respect to which [Chris] has any duties or responsibilities during [his] employment with [Flotek]," both during his employment and for thirty-six months after the termination of his employment by Flotek.[1]

---

[1]  We do not express any opinion on the enforceability of any particular term of the Bonus Agreement or the merits of any of Flotek's claims based on that agreement.

2

Flotek also employed Nancy, beginning in 2008. Chris was the highest-ranking Flotek employee in Flotek's office in Casper, Wyoming, and Nancy was the office manager for that location.

***The Vermeulens Leave Flotek***

Chris resigned from Flotek on July 26, 2013. He established a new company, Tycoon Oilfield Services [hereafter, "Tycoon"], which Flotek alleges that Chris is now using to compete with Flotek in violation of the Bonus Agreement. By August 1, 2013, Chris was communicating via email using a tycoonoilfield.com email address and a signature referencing Tycoon Oilfield Services. In deposition testimony in this case, he affirmed that he is the sole employee of Tycoon, and Nancy confirmed that he is the sole owner.

Nancy resigned from Flotek in or around September 2013. She became a co-owner and vice president of Predator, which was founded around the same time.[2] Predator is incorporated in Wyoming and has its headquarters and principal place of business in Casper, Wyoming, its only office location. As Flotek states in its live petition, "Predator is located directly across the street from Flotek," that is, in Casper. Predator rents, sells, and services downhole drilling motors and related

---

[2] The other co-owners of Predator are Stacy Hall, Lionie Fladeland, Zeke DeCol, and Chase Fladeland. Chris is not an owner or employee of Predator.

products and parts. Predator has six employees, all of whom work at Predator's facility in Casper.

### *Flotek Sues Predator and the Vermeulens*

In October 2013, Flotek sued Chris in Texas, alleging that Chris breached the Bonus Agreement, converted trade secrets and confidential information, and tortiously interfered with Flotek's current and prospective business relationships. It also alleged that Chris "or someone at his direction" engaged in a conspiracy with unspecified persons to "accept[] kick-backs from various machine shop operators for placing certain orders."

Flotek subsequently amended its petition, naming Predator and Nancy as additional defendants. In its live pleading, Flotek first alleges that Chris breached the Bonus Agreement, "both individually and working in concert with [Nancy] Vermeulen and Predator." Second, Flotek asserts that all three defendants have converted Flotek's confidential information, "including but not limited to, customer lists, vendor information, cost and pricing information, and motor designs, for the express purpose of wrongfully competing with Flotek and in an effort to damage Flotek." Third, Flotek argues that each defendant has misappropriated Flotek's trade secrets, listing the same general categories of information identified in the original petition. Fourth, it argues that the defendants have tortiously interfered with Flotek's current and prospective business

4

relationships by using Flotek's confidential and proprietary information to compete with Flotek, although it does not specify which current or prospective relationships or what the defendants did to interfere with them. Finally, Flotek argues that the defendants have engaged in two civil conspiracies: first, that Chris has engaged in the previously-alleged kick-back conspiracy with unspecified third parties and, second, that Chris and Nancy "conspired to set up Predator in order to circumvent the Bonus Agreement, to misappropriate Flotek's trade secrets, and to tortiously interfere with Flotek's current and prospective customers."

According to Flotek, Chris "has used the Confidential Information and technology developed during his employment at Flotek, to produce, and market, a five-inch mud lube motors [sic] in order to poach current customers of Flotek." Specifically, Flotek alleges that Chris obtained his five-inch motor's design from a Chinese supplier identified in the briefing and in the record only as "Shanghai," an "undercover name" that Chris used for the supplier. Flotek alleges that "Shanghai" is also a Flotek supplier and that Flotek considers "Shanghai's" identity to be a trade secret or otherwise confidential. Thus, Flotek alleges that Chris developed and priced the five-inch motor using Flotek's confidential information and trade secrets, including the identity of "Shanghai," the supplier that manufactured it.

In its live pleading, Flotek advances several theories as to why the trial court has jurisdiction over Predator and Nancy:

Predator and Mrs. Vermeulen have purposefully availed themselves of the privileges and benefits of conducting business in Texas by engaging in business in Texas. Predator, through Mrs. Vermeulen[,] placed hundreds of orders with Texas companies for the purchase and repair of downhole oilfield tools from 2013 to 2015. These orders were for motor parts shipped to Predator from Texas. Additionally, Predator shipped motors to Texas for service in Texas. Predator paid Texas companies in excess of $4,000,000 for the purchase of motor parts and for servicing motors. Vermeulen's five-inch mud lube motor was among the motors serviced in Texas. Parts to assemble the five-inch motor were also purchased in Texas. From April 30, 2014 to February 19, 2015, Predator issued over 150 invoices to former Flotek customer and Texas corporation, Integrity Directional Services ("Integrity"). These invoices were for the rental, service and repair of motors. Many of these motors were purchased, serviced and/or repaired by those Texas companies to whom Predator paid over $4,000,000 from 2013 to 2015. Predator and Mrs. Vermeulen have purposefully availed themselves of the privilege of conducting business in Texas. This Court has specific personal jurisdiction over Predator and Mrs. Vermeulen because their contacts with this State are directly related to the causes of action alleged against them in this petition.

Taken as a whole, Flotek's petition alleges that (1) Chris developed and sold a five-inch motor, with assistance from "Shanghai"; (2) in so doing, he breached the Bonus Agreement and committed various torts against Flotek; (3) Predator and Nancy conspired to assist Chris in doing so; and (4) Predator, through Nancy, purchased and sold goods and services in Texas in furtherance of this conspiracy. These allegations, taken together, constitute the only link in the live petition, Flotek's filings below, or the briefing on appeal between a cause of action asserted against Predator or Nancy on the one hand and Texas on the other.

### *The Trial Court Denies Predator's and Nancy's Special Appearances*

Predator and Nancy filed special appearances. Predator argued that it has no or minimal contacts with Texas and is not a party to the Bonus Agreement. It submitted as supporting evidence an affidavit by Stacy Hall, president and co-owner of Predator. Hall testified, "[a]ll of Predator['s] sales, rentals, and services of motors have been provided to customers only in Wyoming, Colorado, or North Dakota." Hall further testified that Predator has never had a mailing address, business license, inventory, phone listing, real or personal property, or registered agent in Texas and has never maintained operations or had employees in Texas. In addition, no Predator employee or representative has traveled to Texas on Predator's behalf. She also testified that Predator "has not received revenues for motors shipped to a Texas address or serviced any motors or other equipment in Texas."

For her part, Nancy argued that she is and has been a resident of Wyoming since 1977, does not own or rent real property in Texas, does not own or operate any business in Texas, does not engage in any personal or business activities in Texas, does not have a Texas mailing address or phone number, and has no assets in Texas. She also observed that she is not a party to the Bonus Agreement and has only traveled to Texas "a handful of times," all on behalf of a former employer unrelated to Predator.

7

Flotek responded to the special appearances, attaching evidence that Predator has sold parts and services to Texas companies Integrity Directional Services and Advanced Concepts Equipment, as well as purchased goods and services from Texas companies, detailed more fully below. It alleges that these contacts are both evidence of and in furtherance of the alleged conspiracies between Predator and the Vermeulens. Critically, the evidence showed that Predator billed various goods and services to Texas addresses and even shipped some parts to Texas, but Flotek did not explain the relationship between those sales and shipments, on the one hand, and the five-inch motor, "Shanghai," or Flotek's purportedly confidential or trade secret information, on the other.

The trial court denied the special appearances, and this appeal followed.

**PERSONAL JURISDICTION**

Predator and Nancy raise nine issues on appeal, which in actuality represent a single attack on the trial court's order denying Predator's and Nancy's special appearances. In issues 1, 2, 3, and 8, Predator argues that Texas has neither general nor specific jurisdiction over Flotek's claims against it.[3] In issues 4, 5, 6, and 9, Nancy makes essentially the same arguments with respect to the trial court's

---

[3] The issues are presented as (1) whether Predator has sufficient minimum contacts with Texas to support personal jurisdiction at all, (2) whether Predator's contacts give rise to specific jurisdiction over Flotek's claims, (3) whether Predator has sufficient continuous and systematic contacts to permit Texas courts to exercise general jurisdiction over it, and (8) whether Predator has sufficient minimum contacts with Texas to satisfy federal due process requirements.

8

assertion of jurisdiction over her.[4]   Finally, in issue 7, Nancy argues that Texas courts cannot exercise jurisdiction over her for actions taken in a purely representative capacity.  These issues can be summarized as a single contention: the trial court erred in denying Predator's and Nancy's special appearances because Texas has neither general jurisdiction nor specific jurisdiction over Predator and Nancy.

### Standard of Review

"Personal jurisdiction is a question of law for the court, even if it requires resolving questions of fact."  *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790–91 (Tex. 2005); *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).  Because the trial court's exercise of personal jurisdiction over a nonresident defendant involves a question of law, an appellate court reviews the trial court's determination of a special appearance de novo.  *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software*, 83 S.W.3d at 794.  However, the trial court frequently must resolve fact questions before deciding the jurisdictional question.  *BMC Software*, 83 S.W.3d at 794; *Capital Tech. Info. Servs., Inc. v. Arias & Arias, Consultores*, 270

---

[4]   The issues are presented as (4) whether Nancy has sufficient minimum contacts with Texas to support personal jurisdiction at all, (5) whether Nancy's contacts give rise to specific jurisdiction over Flotek's claims, (6) whether Nancy has sufficient continuous and systematic contacts to permit Texas courts to exercise general jurisdiction over her, and (9) whether Nancy has sufficient minimum contacts with Texas to satisfy federal due process requirements.

9

S.W.3d 741, 748 (Tex. App.—Dallas 2008, pet. denied) (en banc). In a special appearance, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Leesboro Corp. v. Hendrickson*, 322 S.W.3d 922, 926 (Tex. App.—Austin 2010, no pet.). We do not "disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence." *Ennis v. Loiseau*, 164 S.W.3d 698, 706 (Tex. App.—Austin 2005, no pet.). When a trial court does not issue findings of fact or conclusions of law, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795. We will affirm the trial court's ruling on any legal theory that finds support in the record. *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied).

In a special appearance, the parties bear shifting evidentiary burdens. "[T]he plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff may carry that burden in its petition or in response to the defendants' special appearance. *Proppant Sols., LLC v. Delgado*, 471 S.W.3d 529, 536 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Stull v. LaPlant*, 411 S.W.3d 129, 134 (Tex. App.—Dallas 2013, no pet.). If the plaintiff meets this initial burden, the burden shifts to the defendant filing the special appearance, who must negate all bases of personal

jurisdiction alleged by the plaintiff. *Kelly*, 310 S.W.3d at 658; *Proppant Sols.*, 471 S.W.3d at 536. "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Kelly*, 310 S.W.3d at 658. The defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659. A defendant negates the legal basis for jurisdiction by showing that "if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts . . . fall short of purposeful availment; . . . the claims do not arise from the contacts; or . . . traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

If the nonresident defendant produces evidence negating personal jurisdiction, the burden returns to the plaintiff to show that the court has personal jurisdiction over the nonresident defendant. *Stull,* 411 S.W.3d at 134. A court should dismiss a lawsuit against a nonresident defendant if the exercise of personal jurisdiction lacks an adequate factual or legal basis. *Id.*

The parties must refer the appellate court to those portions of the record that support their arguments. TEX. R. APP. P. 38.1(i) ("The [appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."), 38.2(a) ("An appellee's brief must conform to the requirements of Rule 38.1 . . . ."); *see also Wade v. Comm'n for*

*Lawyer Discipline*, 961 S.W.2d 366, 373 (Tex. App.—Houston [1st Dist.] 1997, no writ); *Brandon v. Am. Sterilizer Co.*, 880 S.W.2d 488, 493 (Tex. App.—Austin 1994, no writ). An appellate court is under no duty to make an independent search of the record for evidence supporting a party's position. *Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 557 n.6 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Hakemy Bros. v. State Bank & Trust Co., Dallas*, 189 S.W.3d 920, 927–28 (Tex. App.—Dallas 2006, pet. denied); *see also Wade*, 961 S.W.2d at 373; *Brandon*, 880 S.W.2d at 493.

### *Applicable Principles of Law*

A Texas court may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due process guarantees. *Moki Mac*, 221 S.W.3d at 574. "Because the Texas long-arm statute reaches 'as far as the federal constitutional requirements of due process will allow,' the statute is satisfied if the exercise of personal jurisdiction comports with federal due process." *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.) (quoting *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996)).

"Personal jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction

12

comports with 'traditional notions of fair play and substantial justice.'" *Moki Mac*, 221 S.W.3d at 575 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant has purposefully availed himself of the privileges of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Id.* (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)). But "a defendant can only trigger specific jurisdiction through its own conduct, not the unilateral acts of third parties." *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 596 (Tex. 2007).

A nonresident defendant's forum-state contacts may give rise to two types of personal jurisdiction: specific and general. *Moki Mac*, 221 S.W.3d at 575. When specific jurisdiction is alleged, the inquiry focuses on the relationship among the defendant, the forum, and the litigation. *Id.* at 575–76. "[P]urposeful availment alone will not support an exercise of specific jurisdiction." *Id.* at 579. Rather, specific jurisdiction has "two co-equal components," and "purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts." *Id.* For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585; *see Rush v. Savchuk*, 444 U.S. 320, 329, 100 S. Ct. 571, 578 (1980)). The operative

13

facts of the litigation are those facts that would be the focus of the trial. *Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *Moki Mac*, 221 S.W.3d at 585).

A general jurisdiction inquiry is very different from a specific jurisdiction inquiry. It requires a "more demanding minimum contacts analysis," *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007) (quoting *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996)), with a "substantially higher" threshold. *Id.* (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (2007)). Usually, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." *Id.* General jurisdiction is "dispute-blind," meaning that it is an exercise of the court's jurisdiction made without regard to the nature of the claim presented or whether the defendant's alleged liability arises from those contacts. *Id.* The central question is whether the defendant's contacts are "continuous and systematic" such that the relationship between the nonresident and the state approaches the relationship between the state and its own residents. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 638 S.W.2d 870, 882 (Tex. 1982) (Pope, J., dissenting), *rev'd*, 466 U.S. 408, 418–19, 104 S. Ct. 1868, 1874 (1984)).

For Texas to exercise specific jurisdiction over Predator in this case, (1) Predator must have made minimum contacts with Texas by "purposefully availing" itself of the privilege of conducting activities here, and (2) its liability must have arisen from or be related to those contacts. *See Moki Mac*, 221 S.W.3d at 576. Likewise, for Texas to exercise specific jurisdiction over Nancy Vermeulen, her own contacts and alleged liability must satisfy these requirements. Even if there is "purposeful availment" in Texas, minimum contacts will not exist, and jurisdiction will not attach, if there is not a "substantial connection" between the alleged contacts and the operative facts of the litigation. *See Info. Servs. Grp., Inc. v. Rawlinson*, 302 S.W.3d 392, 404–05 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

In *Moki Mac River Expeditions v. Drugg*, the supreme court analyzed whether there was a substantial connection between the alleged contact and the operative facts of the suit. 221 S.W.3d at 569. In doing so, the court considered whether the alleged contact would "be the focus of the trial," or "[would] consume most if not all of the litigation's attention[.]" *Id.* at 585. In sum, the court instructed us to consider whether the alleged contact was "the subject matter of the case," or was "related to the operative facts" of the cause of action asserted. *Id.* The court concluded that the alleged contact—a misrepresentation in a sales brochure—was not substantially related to the cause of action asserted—

15

negligence of tour guides in leading a hike of the Grand Canyon that resulted in the plaintiffs' son's death. *Id.* "Whatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to Andy's death, we do not believe it is sufficiently direct to meet due process concerns." *Id.*

"[A]n individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum . . . ." *Burger King v. Rudzewicz*, 471 U.S. 462, 478, 105 S. Ct. 2174, 2185 (1985). "Merely contracting with a Texas resident does not satisfy the minimum contacts requirement[;] [n]or is jurisdiction justified by the single fact that a contract is payable in Texas." *Blair Commc'ns, Inc. v. SES Survey Equip. Servs., Inc.*, 80 S.W.3d 723, 729 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citations omitted). A contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King*, 471 U.S. at 479, 105 S. Ct. at 2185. However, a single purposeful act may suffice to establish minimum contacts providing the basis for jurisdiction. 471 U.S. at 475 n.18, 105 S. Ct. at 1284 n.18. But, purposeful availment requires a defendant to seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Michiana*, 168 S.W.3d at 784.

16

In *Michiana Easy Livin' Country, Inc. v. Holten*, the supreme court stated that the contacts of parties "who reach out beyond one state and create continuing relationships and obligations with citizens of another state" are purposeful rather than fortuitous. *Id.* at 785. The court in *Michiana* concluded that a single sale of a motorhome to a Texas resident was not a purposeful availment because the relationship between the parties would end once the sale was consummated. *Id.* at 786–87.

In contrast, the Court in *Burger King v. Rudzewicz* found that a franchise agreement between a Michigan franchisee, Rudzewicz, and a Florida franchisor, Burger King, resulted in personal jurisdiction over Rudzewicz in Florida because he voluntarily accepted the "long-term and exacting regulation" of his franchise from Burger King's Florida headquarters, and his relationship to Florida could not be considered fortuitous. 471 U.S. at 480, 105 S. Ct. at 2186.

"[B]are assertions of . . . conspiracy, without more, are neither material nor relevant in assessing contacts to determine personal jurisdiction over a nonresident defendant." *Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd.*, 260 S.W.3d 67, 78 (Tex. App—Houston [1st Dist.] 2008, no pet.). The Supreme Court of Texas "decline[d] to recognize the assertion of personal jurisdiction over a nonresident defendant based solely upon the effects or consequences of an alleged conspiracy with a resident in the forum state." *Nat'l Indus. Sand Ass'n v.*

17

*Gibson*, 897 S.W.2d 769, 773 (Tex. 1995); *see also MasterGuard L.P. v. Eco Techs. Int'l LLC*, 441 S.W.3d 367, 376 (Tex. App—Dallas 2013, no pet.) ("A conspiracy claim alone is not enough to establish personal jurisdiction."). Instead, a jurisdictional inquiry focuses on the "critical" concern: "the defendant's conduct and connection with the forum." *Michiana*, 168 S.W.3d at 789.

### The Contacts Relied Upon by Flotek

Flotek alleges and relies on ten categories of contacts to establish jurisdiction over Predator and Nancy. Our review of these allegations and the evidence upon which Flotek relies reveals that Flotek does not allege and support with evidence any connection between (1) Predator or Nancy, (2) Texas, and (3) the "operative facts of the litigation." *See Info. Servs. Grp.*, 302 S.W.3d at 404.

First, Flotek alleges that Predator has done business with Integrity Directional Services, a Texas company. Specifically, Predator has sold various parts and services to Integrity.[5] It sent invoices for at least some of those parts and services to an Integrity address in Fort Worth, Texas. Many of these invoices contain, below the listing of parts and services covered, addresses in Colorado, Wyoming, or North Dakota. None of them reflects that any parts were sent to

---

[5] The parts and services are identified in invoices from Predator, using such terms as "Redress and Inspection," "Seal Kit," "Poly Pac Seals," "Stator Adaptor," "Catch Rod," "Bearing Adaptor," and "Machined Rotor Head and pushed back lobes." None of the invoices explicitly references a five-inch motor, nor does Flotek identify any invoices that are particularly relevant to a five-inch motor.

Texas or that any serviced equipment was sent to or from Texas. Further, Flotek does not identify any invoices from Predator to Integrity that specifically relate to the five-inch motor, parts or information obtained from "Shanghai," or any other connection between Predator and Flotek's substantive allegations of wrongdoing.

Second, Flotek points to emails between Nancy and Kelly Molder, an Integrity employee in Fort Worth, regarding payment of Predator invoices. Nancy also exchanged emails with Jason Gibson, a "Motor Manager" for Integrity whose emails have a signature block containing a phone number with an area code corresponding to the Nacogdoches–Huntsville area of Texas.[6] Flotek does not explain the relevance of these invoices or emails to its causes of action.

Third, Flotek points to what it calls "chargebacks to Integrity for shipping motors to and from Texas." As support, it points to a single document bearing the Predator logo and contact information. This document contains a blank labeled "Sold To" and completed with the words, "Integrity Directional." It lists a line item described as "5" 6 [illegible] Motor [illegible]," with a quantity of forty. It also has a signature line, but is not signed. Adjacent to the entry referring to Integrity Directional is a line reading "Company: EOG Resources," under which the document refers to a location in Laramie, Wyoming. The document does not

---

[6] According to Flotek, the defendants in this suit have also produced more than 900 pages of emails between Predator and Integrity, although the majority of these are not in the record before us.

19

explicitly refer to Texas or any location in Texas. Flotek asserts, nonetheless, that it constitutes a Texas contact by Predator simply because it references Integrity. Flotek does not, however, identify any evidence in support of its claim that this document relates to motors shipped to or from Texas, five-inch motors of the type that it claims are at issue in this case, "Shanghai," or any other aspect of Flotek's substantive claims.

Fourth, Predator purchased motor parts and had motors serviced by Dyna-Drill Technologies LLC, a Texas company that issued its invoices and shipped parts from a location in Katy, Texas. Dyna-Drill has invoiced Predator for more than $3 million in goods and services. It is not clear from the documents upon which Flotek relies, however, what relevance, if any, these transactions have to five-inch motors or to "Shanghai." Flotek does not identify evidence of their relevance, but makes the conclusory assertion that the purchases include five-inch motors.

Fifth, United Machine Works, another Texas company, performed services for Predator. According to Flotek, these services included repairs on downhole motors, including Predator's five-inch motor. The documents to which Flotek cites, however, use terms such as "5" FXD BEND HSG 1.50," "1.50 FIXED BEND HOUSING," and "HARD BANDED PAD." It is not apparent from the face of these documents what relevance, if any, they have to the substance of

20

Flotek's claims, and Flotek does not identify evidence indicating that they have any such relevance.

Sixth, Fusion, Inc., a Houston-based company, provided services to Predator. According to Flotek, "Fusion invoices [which Flotek filed in the trial court] clearly show that [Fusion] services motors for Predator, including [five-inch] motors." One of the invoices in question includes line items containing text such as "PDM ROTOR – 5.00:" 6/7 LOBE 8.0 STAGE." But again, Flotek does not identify any evidence regarding the meaning of these entries or showing that they relate to the five-inch motors that are the basis of many of its claims.

Seventh, BasinTek LLC, another Houston company, received orders from Predator for goods and services totaling more than $380,000. Flotek does not allege that these transactions relate to five-inch motors, "Shanghai," or other allegedly confidential information.

Eighth, Predator shipped engine parts to and from Apex Blasting, a company in Baytown, Texas. Again, Flotek does not allege that these transactions relate to five-inch motors, "Shanghai," or other allegedly confidential information.

Ninth, Tycoon, Chris's company, ordered parts called "tread protectors" from Essentra Pipe Protection, a Texas company, and had them shipped to Predator. Predator also placed orders on its own behalf with Essentra. Again,

Flotek does not allege that these transactions relate to five-inch motors, "Shanghai," or other allegedly confidential information.

Finally, Predator purchased motor parts from Advanced Concepts Equipment, a company in Conroe, Texas. Invoices from Advanced Concepts Equipment appear to show that Chris verbally placed at least some of Predator's orders.[7] Predator also purchased motor parts from Kalsi Engineering, Inc., a company in Sugar Land, Texas, and sold Kalsi parts to Advanced Concepts Equipment.[8] Again, Flotek does not allege that these transactions relate to five-inch motors, "Shanghai," or other allegedly confidential information.

Considering all ten categories together, Flotek alleges that Predator has bought and sold goods and services in Texas, including goods and services used by the defendants to create and sell a five-inch motor. Critically, however, it does not allege which goods and services are relevant to a five-inch motor, goods or services obtained from "Shanghai," or any other aspect of Flotek's substantive claims against Predator. Nor does Flotek allege what percentage of the defendants' total Texas contacts are relevant to a five-inch motor. Thus, Flotek alleges a variety of contacts between Predator and Texas, and it asserts that these contacts

---

[7]     Several invoices to Predator from Advanced Concepts Equipment show a purchase order number of "Verbal Chris."

[8]     The parts are identified as "3 3/4" Kalsi Seals" or "6-1/2" Kalsi Seals." None of the invoices in question refer explicitly to a five-inch motor, nor has Flotek alleged that these purchases are relevant to a five-inch motor.

22

are relevant to its claims against Predator and Nancy, but it identifies no evidence connecting the contacts to the allegations supporting its causes of action. And the only contacts that Flotek alleges that Nancy has had with Texas that are relevant to this suit are actions by Nancy as an agent of Predator.

*General Jurisdiction*

In their third and sixth issues, Predator and Nancy, respectively, argue that they are not subject to general jurisdiction in Texas because they do not have the kinds of "continuous and systematic" contacts necessary to support an exercise of general jurisdiction. *See PHC–Minden*, 235 S.W.3d at 168. Flotek does not address these issues in its briefing, nor did it argue below that Predator or Nancy was subject to general jurisdiction. We agree with Predator and Nancy that Texas does not have general jurisdiction over Flotek's claims against them.

In order for a Texas court to exercise general jurisdiction over a defendant, the defendant usually "must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." *Id.* (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5). The contacts must be "continuous and systematic" before general jurisdiction will attach. *Id.* As the Supreme Court of Texas has explained, "purchases from Texas vendors will not

alone support the exercise of general jurisdiction," nor will payments to Texas vendors, nor will hiring a contractor to perform limited services within the state. *Id.* at 171 (quoting *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex. 2002)); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416–18, 104 S. Ct. 1868, 1873–74 (1984) (trip by company's chief executive officer to forum state, purchases of helicopters from company in forum state, and acceptance of checks drawn on bank in forum state were insufficient to give rise to general jurisdiction).

Although Predator has had numerous contacts with Texas, those contacts are all incidental to particular purchases or sales of goods and services. They have not involved the physical presence of any Predator employees in Texas. And Flotek has not directed our attention to any evidence that Predator has conducted any marketing in or specifically directed at Texas. It is undisputed that Predator does not have any permanent or semi-permanent contacts such as a registered agent, office, bank account, or assets in Texas.

Predator's actions in purchasing goods and services from Texas companies are not enough, taken alone, to subject Predator or, by extension, Nancy to general jurisdiction in Texas, even though those purchases appear to have occurred at somewhat regular intervals. *See Helicopteros Nacionales*, 466 U.S. at 416–18, 104 S. Ct. at 1873–74; *PHC–Minden*, 235 S.W.3d at 168. And Flotek has not

24

established that Predator's sales of parts or services in the state give rise to general jurisdiction; indeed, it has established only that various documents show occasional, not continuous, contacts with residents of the state.

We hold that neither Predator's nor Nancy's Texas contacts alleged by Flotek are so "continuous and systematic" as to give rise to general jurisdiction in Texas courts. We therefore sustain Predator and Nancy's third and sixth issues. These issues do not, however, dispose of the entire appeal, so we turn to the remaining issues on appeal relevant to specific jurisdiction.

### *"Substantial Connection" to Operative Facts of the Litigation*

For Texas to exercise specific jurisdiction in this case, (1) Predator and Nancy must have made minimum contacts with Texas by "purposefully availing" themselves of the privilege of conducting activities here, and (2) their liability must have arisen from or be related to those contacts. *See Moki Mac*, 221 S.W.3d at 576. Even if there is "purposeful availment" in Texas, minimum contacts will not exist, and specific jurisdiction will not attach, if there is not a "substantial connection" between the alleged contacts and the operative facts of the litigation. *Info. Servs. Grp.*, 302 S.W.3d at 404. Because Predator and Nancy have adduced evidence that they do not have sufficient contacts with Texas to subject them to jurisdiction, Flotek bears the burden of identifying evidence that they do. *Stull,* 411 S.W.3d at 134; *Proppant Sols.*, 471 S.W.3d at 536. Should it fail to do so, an

appellate court has no obligation to make an independent search of the record for evidence supporting Flotek's claims. *Univ. Gen. Hosp.*, 403 S.W.3d at 557 n.6; *Hakemy Bros.*, 189 S.W.3d at 927–28; *see also Wade*, 961 S.W.2d at 373; *Brandon*, 880 S.W.2d at 493.

Here, the contacts that Flotek alleges between Predator and Texas have at most a remote relationship to the actual substance of Flotek's claims and are no more than effects of the alleged conspiracy. The alleged contacts are transactions between Predator and various Texas companies for the purchase and sale of various parts and services. But Flotek has not identified which such parts and services are relevant to its claims against Predator or Nancy or to the five-inch motor at the heart of its conspiracy claims. Nor has it clearly articulated how any parts or services relevant to that motor are connected to its asserted causes of action, except to assert generally that everything relevant to the five-inch motor is relevant to the claims against all three defendants. The connections between Texas and Flotek's claims are, at most, only implied or stated in a conclusory manner.

Indeed, Flotek has not clearly stated what any of its claims against Predator or Nancy have to do with Texas. Reading the live petition, Flotek's filings below, and Flotek's brief in this Court as generously as possible, Flotek alleges only that Predator and Nancy acted to further a conspiracy—conceived and consummated outside of Texas—by engaging in acts that eventually had effects in Texas. That

26

is, Flotek alleges that (1) Chris breached the Bonus Agreement, converted confidential information, misappropriated trade secrets, and tortiously interfered with unspecified business relationships; (2) Nancy then acted, outside of Texas, to assist Chris in these actions by conspiring with Chris to establish Predator; (3) Predator, Nancy, and Chris then conspired to bring the fruit of Chris's efforts— the five-inch motor—to market; and (4) this resulted in some alleged sales of unspecified parts and services in Texas.  In short, Flotek does not allege that Predator or Nancy actually did anything in Texas that is actionable, with the exception of acts that are mere results or effects of an alleged conspiracy that was conceived and carried out entirely outside of Texas.

Flotek's allegations against Predator and Nancy are, with respect to their Texas connections, no more than "bare assertions of . . . conspiracy" and thus "neither material nor relevant in assessing contacts to determine personal jurisdiction over a nonresident defendant."  *Capital Fin. & Commerce AG*, 260 S.W.3d at 78; *see also Nat'l Indus. Sand Ass'n*, 897 S.W.2d at 773 (mere "effects or consequences of an alleged conspiracy with a resident in the forum state" cannot support assertion of jurisdiction); *MasterGuard*, 441 S.W.3d at 376 ("A conspiracy claim alone is not enough to establish personal jurisdiction.").  Flotek has failed to demonstrate that, absent the conspiracy allegations, Predator and Nancy have any "conduct and connection with the forum" that is relevant to Flotek's claims.  *See*

27

*Michiana*, 168 S.W.3d at 789. Accordingly, the trial court improperly asserted jurisdiction over Predator and Nancy.

We sustain Predator and Nancy's second and fifth issues. We do not reach the remaining issues, namely issues 1, 4, 7, 8, and 9.

## Conclusion

Neither Nancy nor Predator is subject to general jurisdiction in Texas, and neither has sufficient contacts with Texas that are substantially connected to the operative facts of this litigation to permit a Texas court to exercise specific jurisdiction. The trial court therefore erred in denying Predator's and Nancy's special appearances. We reverse and render judgment dismissing without prejudice Flotek's claims against Predator and Nancy.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.