**Opinion issued June 25, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00830-CV

————————————

**LOLA ENERGY HOLDINGS II, LLC, LOLA ENERGY III, LLC, LOLA ENERGY HOLDINGS III, LLC, LOLA ENERGY PETROCO, LLC, LOLA ENERGY MANAGEMENT III, LLC, MUDDY CREEK ENERGY INVESTMENTS, LLC, AND JAMES E. CROCKARD III, Appellants**

**V.**

**RD HERITAGE GROUP, LLC, Appellee**

---

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Case No. 2021-42439**

---

### MEMORANDUM OPINION

Appellee, RD Heritage Group, LLC, sued LOLA Energy, II, LLC ("LOLA2") for breach of an agreement to acquire and develop oil and gas assets. In the agreement, RD Heritage and LOLA2 identified Harris County, Texas as the

exclusive venue and jurisdiction for litigating any disputes under it, and that is where the suit was filed.

Although this appeal arises from that suit, LOLA2 is not a party to this appeal. The issue in this appeal began when RD Heritage amended its petition to add claims against seven other nonresident defendants, some of whom have names quite similar to LOLA2's. RD Heritage argued the new defendants were bound by the agreement's choice of law and forum selection provisions despite not being parties to the agreement. These new defendants included LOLA2's director Jim Crockard, and corporate appellants LOLA Energy Holdings II, LLC ("LEH2"), LOLA Energy III, LLC ("LOLA3"), LOLA Energy Holdings III, LLC ("LEH3"), LOLA Energy PetroCo, LLC ("PetroCo"), LOLA Energy Management III, LLC ("LEM3"), and Muddy Creek Energy Investments, LLC ("Muddy Creek"). RD Heritage's theory was that LOLA2 was an alter ego of Crockard, meaning Crockard individually was bound by the agreement's choice of law and forum selection provisions, and Crockard's past or current interests in the corporate appellants meant that they also were bound by the provisions under a reverse-piercing theory.

The appellants specially appeared. After the parties engaged in jurisdictional discovery and submitted additional briefing, the trial court denied the special appearance. In three issues, the appellants contend that the trial court erred in denying their special appearance.

We reverse the trial court's order denying the appellants' special appearance and render judgment dismissing RD Heritage's claims against them for lack of jurisdiction.

## Background

**RD Heritage's dispute with LOLA2**

LOLA2 is a Pennsylvania oil and gas operator that develops shale oil and gas resources. RD Heritage, with offices in Nevada, Arizona, and Bahrain, has global business development expertise. In November 2019, RD Heritage and LOLA2 entered a Development Agreement under which LOLA2 was supposed to find oil and gas assets for development and RDH was supposed to find sources of funding. If successful in acquiring an asset, LOLA2 and RD Heritage would create a limited liability company under an 80/20 partnership arrangement (80% to LOLA2 and 20% to RD Heritage) to develop it.

The Development Agreement and a related nondisclosure agreement contain clauses providing that:

> This Agreement shall be governed by and be construed in accordance with the laws of the State of Texas without regard to conflict of law principles. The jurisdiction and venue for any action filed to enforce the terms of this Agreement shall be in Harris County, Texas.

The Development Agreement also contains an exclusivity provision, under which the parties agreed that if LOLA2 obtained investment funds for a particular project from any source directly introduced to it by RD Heritage, the 80/20 partnership

3

arrangement would apply. This provision remained in effect for a period even after the parties terminated the agreement. The length of the post-agreement exclusivity period depended on when and how the agreement terminated. LOLA2 notified RD Heritage that it was terminating the agreement on April 8, 2020, so the exclusivity period continued until April 8, 2022.

Early in the Development Agreement's term, LOLA2 focused its efforts on a particular investment opportunity. RD Heritage connected LOLA2 to Joseph Baran, a broker, who introduced LOLA2 to Summit Partners ("Summit") as a potential source of financing, but the opportunity did not pan out.

In late 2020, LOLA2 identified a second opportunity to acquire oil and gas assets from Key EM Energy, LLC ("KEM") in western Pennsylvania. RD Heritage connected LOLA2 to another potential source of financing for the acquisition, As LOLA2's exclusive negotiating period for the opportunity neared its end, though, RD Heritage's potential source of funding backed out.

In January 2021, LOLA contacted RD Heritage for other funding sources, and RD Heritage suggested several, including Summit. With LOLA2's assent, RD Heritage contacted Summit with information about LOLA2 and the KEM opportunity.

Around the same time, LOLA2's three-member board of managers decided to transfer the rights to pursue the KEM opportunity to Muddy Creek. LOLA2, its

4

subsidiary, LOLA Energy Resources, and Muddy Creek entered an agreement that assigned LOLA2's rights to acquire KEM to Muddy Creek (the "Walk Away Agreement") in exchange for valuable consideration. Crockard, who was president of all three entities, signed the Walk Away Agreement for each. The same day, LOLA3 hired Durham Capital Corporation ("Durham") to be the debt broker for LOLA3's acquisition of KEM.

Durham brokered $90 million in debt financing for the KEM acquisition. $60 million of that amount was provided by Summit—the same source of financing that LOLA2 had learned of through Baran. LOLA3 raised the additional $16 million in equity needed to complete the acquisition. The transaction closed on March 22, 2021.

RD Heritage notified Crockard that it was invoking its right under the Development Agreement's exclusivity provision to a 20% interest in the KEM asset venture. When it did not receive a positive response, RD Heritage brought this suit.

**Trial court proceedings**

RD Heritage sued LOLA2 for breach of the Development Agreement's exclusivity provision, asserting that it was it was responsible for Summit's involvement in the KEM acquisition but that LOLA wrongfully cut RD Heritage out of the deal.

Eighteen months later, RD Heritage amended its petition to add the appellants as defendants. RD Heritage argued that the trial court had personal jurisdiction over the appellants because, among other things:

- They contractually agreed to personal jurisdiction over this dispute in Texas;
- They are related entities that committed, conspired to commit, or assisted or encouraged the commission of intentional torts affecting a contract calling for personal jurisdiction in Texas; or
- LOLA2 is the alter ego of Crockard, personal jurisdiction over LOLA2 can be imputed to Crockard, and Crockard owns majority stakes, directly or indirectly, and has operational control, over Muddy Creek [and the other appellants].

After the appellants filed their special appearance, the parties conducted jurisdictional discovery and supplemented their filings.

The appellants attached evidence to their special appearance showing that Texas courts did not have general or specific jurisdiction over them. They argued that Texas courts could not exercise personal jurisdiction over them because the Walk Away Agreement had no connection to Texas. The negotiations and execution of the Walk Away Agreement all occurred in Pennsylvania. Also, no alleged harm resulting from it would be felt in Texas because RD Heritage was a Nevada company. And Crockard's contacts with Texas on behalf of LOLA2 did not support jurisdiction over him individually in Texas.

The appellants asserted that RD Heritage had not borne its burden to provide evidence in support of its assertion that Crockard was an alter ego of LOLA2. RD

6

Heritage did not show that Crockard exercised a level of control over LOLA2 that was atypical of or inconsistent with his roles as an indirect minority owner, officer, and member of its board of managers. Further, there was no evidence that Crockard failed to keep corporate and personal assets separate or that LOLA2 was inadequately capitalized.

RD Heritage responded that the Walk Away Agreement assigned LOLA2's rights to acquire KEM to Muddy Creek, in which Crockard held a majority interest. It attached evidence showing Crockard's ownership and control over the corporate appellants, asserting that the corporate appellants were all intertwined with each other and LOLA2.

RD Heritage argued that Crockard was individually liable because, acting through LOLA2 and the corporate appellants, he was the "prime mover" in the scheme to interfere with RD Heritage's contractual right to a 20% interest in the KEM asset venture. RD Heritage emphasized that Crockard was not only an investor in LOLA2 but also its chief executive officer, president, board manager with voting rights, and in-house counsel. He oversaw and controlled day to day operational and personnel decisions for LOLA2, and had the authority to enter into and approve of contracts for LOLA2, such as the Agreement and the Walk Away Agreement. And Crockard used his own control over Muddy Creek and the other corporate appellants to take the KEM acquisition opportunity away from LOLA2—and RD Heritage.

In their reply, the appellants maintained that RD Heritage did not prove that Crockard was subject to personal jurisdiction as LOLA2's alter ego because it did not show Crockard (1) exercised actual control over LOLA2 that was inconsistent with the roles in which he served LOLA2, (2) treated LOLA2's property as his own, or (3) "denuded" LOLA2 of its assets. The evidence showed that the decision to enter the Walk Away Agreement was made jointly by all three members of LOLA2's board of managers. Crockard's execution of the Walk Away Agreement based on that decision is not evidence of atypical control over LOLA2.

Appellants also asserted that RD Heritage also failed to show Crockard could be treated as the alter ego of any of the corporate appellants. And none of the misconduct alleged by RD Heritage occurred in Texas.

The trial court denied the special appearance.

### Special Appearance

A.   **Standard of Review and Procedure**

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023); *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). But courts often must resolve questions of fact in resolving this question of law. *LG Chem Am.*, 670 S.W.3d at 346. When, as here, the trial court did not issue findings of fact and conclusions of law, all relevant facts that are necessary to support

8

the judgment and supported by evidence are implied. *Old Republic*, 549 S.W.3d at 558. We presume that the trial court resolved all factual disputes in favor of its ruling. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871–72 (Tex. 2010).

The parties bear shifting evidentiary burdens of proof in a special appearance. *Old Republic*, 549 S.W.3d at 559. The plaintiff bears the initial burden to plead allegations sufficient to confer jurisdiction under the long-arm statute. *Id.* We consider allegations both in the plaintiff's petition and in the plaintiff's response to the special appearance. *See Predator Downhole Inc. v. Flotek Indus., Inc.*, 504 S.W.3d 394, 402 (Tex. App.—Houston [1st Dist.] 2016, no pet.). If the plaintiff meets this initial burden, the burden shifts to the nonresident defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Old Republic*, 549 S.W.3d at 559. "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010).

The defendant can negate jurisdiction on either a factual or a legal basis. *Id.* at 659. Jurisdiction can be negated on a legal basis by showing that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction." *Old Republic*, 549 S.W.3d at 559 (quoting *Kelly*, 301 S.W.3d at 659). Jurisdiction can be negated on a factual basis by presenting evidence that the

defendant's "contacts with Texas fall short of purposeful availment." *Id.* (quoting *Kelly*, 301 S.W.3d at 659).

If the nonresident defendant produces evidence negating personal jurisdiction, the burden shifts back to the plaintiff to show that the court has personal jurisdiction over the defendant. *Predator Downhole*, 504 S.W.3d at 402.

**B.    Personal Jurisdiction**

Texas courts may assert personal jurisdiction over a nonresident defendant when (1) the long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional due process guarantees. *Old Republic*, 549 S.W.3d at 558. The long-arm statute is satisfied by a defendant doing business in Texas, including by contracting with a Texas resident where either party is to perform the contract in Texas; by committing a tort in Texas; or by recruiting Texas residents directly or through an intermediary located of Texas. TEX. CIV. PRAC. & REM. CODE § 17.042. Because the long-arm statute extends personal jurisdiction "as far as the federal constitutional requirements of due process will allow," the statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)). Before a court may exercise personal jurisdiction over a nonresident defendant, the defendant must have "certain

minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Old Republic*, 549 S.W.3d at 559 (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). A nonresident defendant "establishes minimum contacts with a state when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)).

In determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas, courts consider three factors:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Id.* (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013)). A defendant's activities "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Id.* (quoting *Retamco Operating*, 278 S.W.3d at 338).

A defendant's contacts with a forum state may give rise to either general or specific personal jurisdiction. *Id.* General jurisdiction, which is not at issue here, requires that the nonresident defendant's "affiliations with the state are so

11

continuous and systematic as to render [it] essentially at home in the forum State." *Id.* at 565 (quoting *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016)). Specific jurisdiction, which is in dispute here, arises when the plaintiff's causes of action against the nonresident defendant arise from or relate to the defendant's purposeful in-state activities. *Moki Mac*, 221 S.W.3d at 576. A specific jurisdiction analysis focuses on the relationship between the forum, the defendant, and the litigation. *Old Republic*, 549 S.W.3d at 559. The contacts must be both purposeful and substantially connected to the operative facts of the litigation. *Id.* at 559–60; *Moki Mac*, 221 S.W.3d at 585. The operative facts of the litigation are those facts that "will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question." *Moki Mac*, 221 S.W.3d at 585; *Fuji Elec. Co. v. Perez*, 615 S.W.3d 508, 520 (Tex. App.— Houston [1st Dist.] 2020, no pet.).

## C.     Analysis

The appellants presented undisputed evidence that Texas courts could not exercise general jurisdiction over them. As to specific jurisdiction, RD Heritage asserted that the appellants committed, conspired to commit, or assisted or encouraged the commission of intentional torts affecting a contract calling for personal jurisdiction in Texas. But RD Heritage does not allege any act by an appellant occurring in Texas, and the appellants' uncontroverted evidence showed

12

that any alleged misconduct occurred solely in Pennsylvania. The appellants also pointed out that because RD Heritage was based in Nevada, any harm flowing from the alleged misconduct would not be felt in Texas. This evidence negated RD Heritage's assertion that the appellants were subject to specific jurisdiction. *See Vinmar Overseas Singapore PTE Ltd. v. PTT Int'l Trading PTE Ltd.*, 538 S.W.3d 126, 133 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (explaining plaintiff that fails to allege act by defendant occurring in Texas has not met initial burden of pleading act sufficient to invoke jurisdiction over nonresident defendant); *see also Moncrief Oil*, 414 S.W.3d at 157 (holding that nonresident defendant was not subject to jurisdiction for tortious interference claim where alleged acts of interference occurred outside Texas).

RD Heritage also argues that the appellants are bound by the Development Agreement's forum selection clause because LOLA2 is the alter ego of Crockard, and Crockard's execution of the Development Agreement can be imputed to the corporate appellants under a reverse-piercing theory.[1]

---

[1]  RD Heritage also argued that the appellants should be bound to the forum selection clause as non-signatories, but this argument does not respond to the jurisdictional arguments and evidence presented in the appellants' special appearance, so we do not address it here. *See Vinmar Overseas Singapore PTE Ltd. v. PTT Int'l Trading PTE Ltd.*, 538 S.W.3d 126, 138 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("Though contract or agency theories may be used by non-signatories to enforce forum-selection clauses in contracts, . . . such theories should not be used to bypass the constitutional due-process analysis required in personal jurisdiction cases.").

Proof of corporate veil piercing can support a finding that the corporate structure is, in fact, the alter ego of a corporate shareholder, officer, or director. *NMRO Holdings, LLC. v. Williams*, No 01-16-00816-CV, 2017 WL 4782793, at *2 (Tex. App.—Houston [1st Dist.] Oct. 24, 2017, no pet.) (mem. op.); *see Nugent v. Est. of Ellickson*, 543 S.W.3d 243, 264 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("The concept of alter ego, as typically applied in the corporate context, collapses the distinction between a corporation and its shareholder or shareholders by treating them as one and the same for liability purposes."). Under alter ego theory, an individual may be liable for corporate obligations when "a corporation is organized and operated as a mere tool or business conduit of another" and "there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Wilson v. Davis*, 305 S.W.3d 57, 69 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Reverse-piercing theory applies the alter ego doctrine in reverse by holding a corporation's assets liable for the acts of individuals who treated the corporation as their alter ego. *NMRO Holdings*, 2017 WL 4782793, at *3; *see Zahra Spiritual Tr. v. United States*, 910 F.2d 240, 243–44 (5th Cir. 1990).

Under either theory, courts determine whether an alter ego relationship exists by examining the total dealings of a corporation and the individual and consider the degree to which corporate and individual property have been kept separately, the

14

amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the individual used the corporation for personal purposes. *Richard Nugent & CAO*, 543 S.W.3d at 266; *NMRO Holdings*, 2017 WL 4782793, at \*3. An individual's role as an officer, director, or majority shareholder of an entity alone is not enough to support a finding of alter ego. *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 482 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Similarly, a corporation's centralized control, mutual purposes, shared finances, or creation of affiliated corporations to limit liability while pursuing common goals is not enough to disregard the corporate form. *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). There must also be proof of "the kinds of abuse that the corporate structure should not shield," such as "fraud, evasion of existing obligations, circumvention of statutes, monopolization, and criminal conduct." *JNM Express, LLC v. Lozano*, 688 S.W.3d 327, 335 (Tex. 2024) (internal quotations omitted).[2]

---

[2] Courts will disregard the corporate fiction where, among other things, (1) it is used as a means of perpetrating fraud; (2) the corporation is organized and operated as a mere tool or business conduit of another corporation; and (3) the corporate fiction is used as a means of evading an existing legal obligation. *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008) (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 271–72 (Tex. 1986)); *see also* TEX. BUS. ORGS. CODE § 21.223(b) (allowing corporate veil to be pierced "if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate").

"Because Texas law presumes that two separate corporations are distinct entities and that a corporation is an entity separate from its officers and owners, the party seeking to ascribe one corporation's actions to another corporation or individual for jurisdictional purposes by piercing the corporate veil must prove the alter ego relationship." *Cappuccitti*, 222 S.W.3d at 482; *see PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173, 175 (Tex. 2007). This presumption of separateness means the plaintiff bears "the burden of proving the theory of alter ego" before the burden shifts to the nonresident defendant "to negate it." *Hoffmann v. Dandurand*, 180 S.W.3d 340, 350 (Tex. App.—Dallas 2005, no pet.).

The trial court could not conclude that the corporate appellants are subject to jurisdiction under the Agreement without first determining that Crockard is the alter-ego of LOLA2, so we begin by considering whether the record supports such a determination.

In asserting that Crockard controlled LOLA2, RD Heritage relied on evidence of (1) Crockard's ownership interest in LOLA2, (2) Crockard's position as a director and officer of LOLA2, and (3) Crockard negotiating and executing agreements on behalf of LOLA2. None of this evidence shows that Crockard exercised atypical control over LOLA2.

Crockard has served as LOLA2's president and chief executive officer since 2017. He has indirect ownership of a minority interest of about 10 percent in

16

LOLA2.[3] And he has served as a member of LOLA2's three-member board of managers since 2019. RD Heritage asserts that Crockard's authority to enter and approve contracts for LOLA2 shows atypical control. But entering and approving contracts on behalf of their employing entity are everyday duties for presidents and chief executive officers.[4] Crockard's exercise of those duties does not show that Crockard used LOLA2 for personal purposes. *See Richard Nugent & CAO*, 543 S.W.3d at 266; *NMRO Holdings*, 2017 WL 4782793, at *3. The fact that LOLA2 transferred those rights to an entity majority-owned by Crockard does not suggest a different result.

Because RD Heritage has not shown that Crockard had atypical control over LOLA2 through a financial interest or through his role as president and chief executive officer, that he used LOLA2 for personal purposes, or the presence of any other alter ego factors, it has not borne its burden to rebut the presumption of LOLA2's corporate separateness. *See Hoffman*, 180 S.W.3d at 350 (explaining that because appellee did not meet his burden of proving alter ego theory, burden never shifted to appellant to negate it). Thus, the evidence does not support a finding that the Development Agreement's forum selection clause applies to Crockard

---

[3]  The remainder of LOLA2's class A membership interests are held by LEH2 (96.3%); Muddy Creek (2.1%); and six individuals with unrelated to Crockard.

[4]  The undisputed evidence also shows that LOLA2's three-member Board of Managers, and not Crockard alone, decided to enter the Walk Away Agreement.

17

individually. And because RD Heritage has not shown that LOLA2 is Crockard's alter ego, it cannot show that reverse-piercing links the forum selection clause to any of the corporate appellants.

For these reasons, we hold that the trial court erred in denying the appellants' special appearance.

## Conclusion

We reverse the trial court's order and render judgment dismissing RD Heritage's claims against the appellants for lack of jurisdiction.


Clint Morgan
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.