**JAY ZABEL & ASSOCIATES, LTD., Appellant**

v.

**COMPASS BANK, Appellee**

**NO. 01-16-00905-CV**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued June 29, 2017

William K. Luyties, Paul J. Goldenberg, LORANCE & THOMPSON, PC, 2900 North Loop West, Suite 500, Houston, Texas 77092, for Appellant.

Michael D. Conner, William P. Huttenbach, HIRSCH & WESTHEIMER, P.C., 1415 Louisiana, 36th Floor, Houston, Texas 77002, for Appellee.

Panel consists of Justices Higley, Bland, and Brown.

## OPINION

Laura Carter Higley, Justice

Jay Zabel & Associates, Ltd., an Illinois law firm, appeals the trial court's denial of its special appearance in a suit brought against it by Compass Bank. Compass asserts that the trial court has specific personal jurisdiction over Zabel because the bank's causes of action arise from Zabel's purposeful contacts with the State of Texas. Zabel disagrees, contending that it did not purposefully avail itself of the privilege of conducting activities in Texas, thus, it does not have the requisite minimum contacts with Texas to be subject to specific personal jurisdiction in this forum. Because we agree with Zabel, we reverse the trial court's order and render judgment dismissing Compass's claims.

## Background[1]

Zabel is a six-attorney law firm incorporated in Illinois and located in Chicago. The firm specializes in tax law and real estate transactions.

Around July 2015, one of the firm's younger associates, Jori E., informed the firm's senior managing attorneys that her brother, Brent, an attorney employed by a tort litigation firm, had a legal matter, an international sales transaction, to refer to Zabel. The transaction entailed the sale of a piece of heavy equipment, a dredger, by a Chinese company, Sinochem, to a Chicago construction company, Clune Construction. Sinochem sought to have a law firm represent it to facilitate the sale. Brent told Jori that he had never represented Sinochem, but he was familiar with the company because he had clients who had done business with it.

Zabel received an email from Shi Dai, a person purporting to be Sinochem's representative. Dai requested Zabel to prepare a purchase agreement for the sale of the dredger to Clune Construction, and Zabel agreed to represent Sinochem in the transaction. Jeff Sanchez, a senior partner with Zabel, began corresponding with Dai by email regarding the firm's representation of Sinochem. Sanchez forwarded an engagement letter for Sinochem to sign to retain the firm. Dai responded to the email, indicating that the firm's rate was acceptable, but Sinochem did not sign the engagement letter.

Sanchez and Dai continued to exchange emails regarding the sale of the dredger. In one email, Sanchez asked Dai for a number of documents related to the details of the sale, but Dai never sent the requested documents. Dai did, however, inform Sanchez of the purchase price of the dredger. He told Sanchez that Clune Construction would be making a partial payment to show that it was serious about the purchase. Dai informed Sanchez that Sinochem had instructed Clune to send the partial payment to Zabel. Dai told Sanchez that, once it received the partial payment, Zabel should deduct its retainer fee of $2,500 from the funds received from Clune. Sanchez responded to Dai, informing him that Zabel could not deduct its retainer from the funds sent by Clune without Clune's consent.

---

1. Many of the background facts are derived from the deposition of Jeff Sanchez, an attorney with the Zabel law firm.

A person purporting to be a representative of Clune Construction then contacted Sanchez by telephone. That person consented to Zabel deducting its retainer from the funds that Clune would send to Zabel. The representative also sent a follow-up letter confirming Clune's consent.

A check, in the amount of $385,966.76, was delivered to Zabel by UPS parcel. The return address on the package was Clune's Chicago address. The upper left portion of the face of the check ("the Check") identified the maker of the Check as follows: "M/I Title, LLC, Escrow Account, 10920 West Sam Houston Parkway North, Houston, TX 77064." In the middle of the upper portion of the Check was "BBVA Compass." The lower right hand corner of the Check contained two handwritten signatures. The Check was payable to "Jay Zabel & Associates, Ltd." and gave the law firm's Chicago address. The memo line of the Check had the notation: "Clune Construction Company."

Later, Sanchez testified in his deposition that he "briefly" looked at the Check. Sanchez stated that he had noted that it was being paid from the account of a title company, but he did not find this unusual given that it was on behalf of a construction company, Clune.

Zabel indorsed the Check to its Chicago bank, Harris Bank, for deposit into Zabel's client trust fund account. The Check went through the normal banking channels and was presented to and ultimately paid by Compass out of M/I Title's account in Harris County, Texas. The amount of the check, $385,966.76, was transferred from M/I Title's Compass bank account to Zabel's client trust fund account in Chicago.

After the funds were deposited into Zabel's account, additional emails were sent by Dai, instructing Zabel to wire the funds to accounts outside the United States. Sanchez also spoke on the phone with Dai, Dai's boss, and Clune's representative, regarding the transfer of the funds. Ultimately, the funds, save Zabel's retainer, were wire transferred from Zabel's client trust fund account to two foreign accounts.

After the money left Zabel's account, Sanchez received a call from a representative of M/I Title, informing Sanchez that the $385,966.76 check was counterfeit. Sanchez reported the scam to the FBI and to the Chicago police. M/I Title also reported the fraud to Compass, verifying that the check had not been a genuine check issued by M/I Title. The approximately $2,900 that Zabel had kept in its account as its retainer fee was returned to Compass. However, the remainder of the funds could not be recovered from the foreign accounts.

Compass filed suit against Zabel in Harris County District Court, alleging that Zabel "deposited a counterfeit or fraudulent check and was never entitled to receive those proceeds from M/I Title." Compass claimed that, "under various [UCC] transfer and presentment warranties, because the Check was not properly deposited and/or negotiated, [Zabel] is liable to Compass Bank for the full amount of the Check." Compass sued Zabel "for breaches of UCC transfer and presentment warranties, other UCC provisions such as UCC § 3.406, negligence, unjust enrichment, breach of contract, conversion, contribution and indemnification."

In its petition, Compass identified itself as "an Alabama state bank doing business in Harris County, Texas" and recognized that Zabel "is a corporation organized under the laws of Illinois, whose principal office is located [in] Chicago, IL." Under the heading, "Jurisdiction and Venue," Compass averred, "The Check itself reflects that it is purportedly issued by a company with an address in Harris Coun-

ty, Texas, so [Zabel] believed that it was doing business with a company located in Harris County." Compass further alleged, "The Check was drawn on a bank account located in Harris County. Thus, when Defendant deposited the Check, Defendant knew or should have known that it would be presented to a bank for payment in Harris County."

In response to Compass's petition, Zabel filed a special appearance, asserting that the trial court lacked personal jurisdiction over it and requesting dismissal of the suit. Zabel supported the special appearance with Sanchez's affidavit and with his deposition testimony. In his affidavit testimony, Sanchez confirmed that Zabel is an Illinois corporation located in Chicago. With regard to the firm's law practice, Sanchez stated that Zabel has prepared tax returns for "a few Texas clients" and represented clients purchasing real estate in Texas. But Sanchez explained that the legal work performed by Zabel on those matters was performed at its law office in Illinois with communications and transactions related to that work being done remotely and electronically. Sanchez indicated that Zabel had no other connection to Texas, stating that Zabel "has no assets, bank accounts, property, or any other presence in the State of Texas."

With respect to this lawsuit specifically, Sanchez averred,

On August 17, 2015, I received a check from M/I Title, LLC, Escrow Account at BBVA Compass. Clune Construction Company was in the check's memo. The check was deposited in [Zabel's] IOLTA account at Harris Bank in Chicago, Illinois.... I did not initiate or direct emails, contacts, or phone calls to anyone within the State of Texas related to the negotiation of the check which forms the basis of this lawsuit. No one from Zabel & Associates initiated or directed emails, contacts, or phone calls to anyone within the State of Texas related to the negotiation of the check which forms the basis of this lawsuit.

In further support of its special appearance, Zabel claimed that it had not purposefully availed itself of conducting activities in Texas. It averred that it "had no contacts with Texas in this transaction [the sale of the dredger] other than it deposited a check drawn off of a Texas bank." Zabel pointed out that "[n]one of the parties involved in the equipment purchase were from Texas or in Texas. The [dredger] being purchased was not in Texas. None of Zabel's communications regarding the transaction were initiated to or from Texas."

Zabel claimed, "It was merely happenstance that the check sent to Zabel was from a Texas bank." It further asserted, "Texas had no connection to the transaction and Zabel had no reason to believe that [it] was purposefully availing himself of Texas law or jurisdiction by merely depositing the check in [its] local Illinois bank account." And Zabel asserted that it "did not seek out or intend for Texas to have any part of the transaction.... [I]t was just incidental to the transaction that the check was drawn on a Texas bank as Texas had no other part or connection to the transaction."

Compass responded to Zabel's special appearance, asserting that the trial court had specific personal jurisdiction over Zabel. Compass offered a copy of the Check to support its response. Compass pointed out that it was Zabel's unilateral decision to negotiate the Check without first ensuring that it was valid, despite numerous "red flags" indicating that the Check was fraudulent. Compass pointed out that Zabel's decision to negotiate the Check resulted in the Check being drawn on the

account of a Texas resident from a Texas bank account.

Compass claimed that, by depositing the Check, Zabel should have known that it was making "various warranties to the depositary bank and all upstream banks," including Compass, regarding the Check's validity. Compass asserted that Zabel should have "reviewed the check and [seen] that it was purportedly drawn on a Harris County resident." From this, Compass argues, Zabel should have known that the Compass account was also in Harris County.

Compass asserted that, because a check is considered a contract, "[Zabel] was purportedly entering into a contract with the purported maker of the check, M/I Title, LLC, a Harris County resident." Compass continued, "[I]t is on this specific contact with Texas that [Zabel] was sued. Indeed, but for [Zabel] deciding to negotiate and deposit the check (which is a purported contract with a Texas resident), [Zabel] would not have been sued and thus jurisdiction is warranted."

Following a hearing, the trial court signed an order denying Zabel's special appearance. Zabel filed this interlocutory appeal, challenging the trial court's order.[2] In one issue, Zabel contends that the trial court erred when it denied its special appearance.

## Special Appearance

### A. Standard of Review

 Whether a court can exercise jurisdiction over a nonresident defendant is a question of law. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010). Thus, we review a trial court's decision on special appearances de novo. *Am. Type Culture Collection, Inc. v. Coleman,*

83 S.W.3d 801, 805–06 (Tex. 2002). "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence." *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013).

 In the context of a special appearance, the parties bear shifting evidentiary burdens. The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). The plaintiff may carry that burden in its petition or in response to the defendant's special appearance. *Predator Downhole Inc. v. Flotek Indus., Inc.*, 504 S.W.3d 394, 402 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Proppant Sols., LLC v. Delgado*, 471 S.W.3d 529, 536 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Once the plaintiff has met this burden, the defendant then assumes the burden of negating all potential bases for personal jurisdiction alleged by the plaintiff. *Kelly*, 301 S.W.3d at 658.

 The defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659. A defendant negates the legal basis for jurisdiction by showing that "if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts ... fall short of purposeful availment; ... the claims do not arise from the contacts; or ... traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

 If the nonresident defendant produces evidence negating personal jurisdic-

2. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West 2015) (permitting inter-

locutory appeal from order granting or denying a special appearance).

tion, the burden returns to the plaintiff to show that the court has personal jurisdiction over the nonresident defendant. *Predator Downhole Inc.*, 504 S.W.3d at 402. A court should dismiss a lawsuit against a nonresident defendant if the exercise of personal jurisdiction lacks an adequate factual or legal basis. *Id.*

## B. Legal Principles Governing Personal Jurisdiction

Defendants are subject to personal jurisdiction in Texas when two criteria are satisfied: (1) the Texas long arm statute must grant jurisdiction; and (2) the exercise of jurisdiction must comport with federal and state constitutional guarantees of due process. *Searcy v. Parex Resources, Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). Texas's long-arm statute "extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit." *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). To comport with due process requirements, two requirements must be met: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017) (quoting *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

"Sufficient minimum contacts exist when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Searcy*, 496 S.W.3d at 67 (quotation omitted). Purposeful availment involves contacts that the defendant purposefully directed into the forum state. *Id.* (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)).

"A defendant's contacts with the forum may give rise to either general or specific jurisdiction." *M & F Worldwide Corp.*, 512 S.W.3d at 885. In this case, Compass asserts that Zabel's alleged minimum contacts with Texas gives rise to specific jurisdiction. "Broadly stated, specific jurisdiction exists when the plaintiff's claims 'arise out of' or are 'related to' the defendant's contact with the forum." *Searcy*, 496 S.W.3d at 67 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

"[T]he defendant's relationship, not the plaintiff's relationship, with the forum state is the proper focus of the specific jurisdiction analysis; that is, courts must consider the relationship between the defendant, the forum state, and the litigation." *Id.* Three principles govern the purposeful-availment analysis as applied to specific personal jurisdiction: (1) "only the defendant's contacts with the forum" are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be "purposeful" and not "random, isolated, or fortuitous"; and (3) the defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" such that it impliedly consents to suit there. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (citations omitted).

"The 'minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number.' " *Searcy*, 496 S.W.3d at 67 (quoting *Retamco Operating, Inc. v. Republic*

*Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). The relationship between the alleged liability and the defendant's contacts with the forum cannot be too attenuated; "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 584–85 (Tex. 2007). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Retamco Operating*, 278 S.W.3d at 338 (citation omitted).

## C. Analysis

■ Compass acknowledges that Zabel did not purposefully select M/I Title or its Texas bank account as the target of the scam; nor did Zabel otherwise assist in making the counterfeit check. Rather, those acts were committed by Dai and his cohorts.

Compass also acknowledges that the underlying transaction involved here—the purported sale of the dredger—involved forums ranging from Illinois to China but did not involve Texas. Compass claims that Zabel can nonetheless be held liable for—and asserts specific personal jurisdiction is supported by—Zabel's own purposeful, distinct acts relating to the negotiation of the Check. Compass avers that, ignoring numerous warning signs indicating that the Check was a counterfeit, Zabel nevertheless proceeded to sign the Check and place it "in the chain of collection for payment by Compass in Texas against the account of a Texas entity." Compass contends that this contact with Texas is sufficient to subject Zabel to specific personal jurisdiction in Texas, and Compass stresses that it is this discrete conduct of Zabel that constitutes the operative facts on which it bases its claims against Zabel.

Compass further asserts that Zabel's contact with Texas satisfies the requirements of the Texas Long-Arm statute, thereby subjecting Zabel to the jurisdiction of Texas courts. Under the long-arm statute, a nonresident does business in Texas if it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1) (West 2015). Compass correctly points out that "a check—as a type of negotiable instrument—is a formal contract." *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 382 (Tex. 2011). Zabel, however, responds that a counterfeit check, such as the one here, cannot form the basis of a contract. Compass in turn retorts that, regardless of its authenticity, Zabel believed the Check was genuine, presented it for payment, and received funds out of M/I Title's Texas bank account. Zabel nonetheless maintains that its conduct with respect to endorsing and depositing the Check in its bank account—acts that occurred in Illinois—are not sufficient minimum contacts to subject it to specific personal jurisdiction in Texas courts.

Even assuming, without deciding, that the counterfeit check formed the basis of a contract for purposes of the long-arm statute, the record evidence must still show that the exercise of jurisdiction over Zabel comports with federal and state constitutional guarantees of due process. *See Searcy*, 496 S.W.3d at 66. We agree with Zabel that it does not.

■ It is well-established that "[m]erely contracting with a Texas resident does not satisfy the minimum contacts requirement[;] [n]or is jurisdiction justified by the single fact that a contract is payable in Texas." *Blair Commc'ns, Inc. v. SES Survey Equip. Servs., Inc.*, 80 S.W.3d 723, 729 (Tex. App.—Houston [1st

Dist.] 2002, no pet.); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985) ("[A]n individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum[.]"). "However, a single purposeful act may suffice to establish minimum contacts providing the basis for jurisdiction." *Predator Downhole, Inc.,* 504 S.W.3d at 402 (citing *Burger King,* 471 U.S. at 475 n.18, 105 S.Ct. at 2184 n.18). But, we remain mindful that purposeful availment requires a defendant to seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* (citing *Michiana,* 168 S.W.3d at 784). To evaluate purposeful availment with respect to contracting with a Texas resident, courts have considered such factors as prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing to determine whether the defendant purposefully established minimum contacts with the forum. *See Internet Advert. Grp., Inc. v. Accudata, Inc.,* 301 S.W.3d 383, 389 (Tex. App.—Dallas 2009, no pet.).

▮ There were no prior communications, negotiations, or course of dealing between Zabel and M/I Title. Nevertheless, Compass asserts that Zabel availed itself of the benefit of Texas' laws because it indorsed the Check, thereby warranting its validity, and sent it into the banking channels to be paid out of the account of a Texas resident. It is not disputed that the injurious effect of Zabel's actions was felt by a Texas resident in Texas. The face of the Check indicated that it would be drawn on an account belonging to a Texas business. However, "[m]ere knowledge that the 'brunt' of the alleged harm would be felt—or have effects—in the forum state is in-

sufficient to confer specific jurisdiction." *Searcy,* 496 S.W.3d at 68–69; *see also Myers v. Emery,* 697 S.W.2d 26, 32 (Tex. App.—Dallas 1985, no writ) (holding that Oklahoma law firm's receipt and deposit of Texas client's payments drawn on a Texas bank were fortuitous and thus insufficient to establish personal jurisdiction against firm in Texas state court).

To support its assertion that Zabel purposefully availed itself of the privilege of conducting activities within Texas, Compass asserts that Zabel "knew or should have known that the [C]heck would be presented to a Texas bank, and the funds would be withdrawn from the Texas account." On its face, the Check indicates that the maker of the Check, M/I Title, was located in Texas, but the Check does not specify the location or the forum of the checking account on which the Check would be presented for payment. The Check shows that the account is with "BBVA Compass Bank," but does not indicate that the account is located in Texas.

Compass, which identifies itself in its original petition as "an Alabama state bank," acknowledges that the Check does not indicate where the account is located; Compass nonetheless asserts that Zabel should have known that M/I Title's Compass checking account is located in Texas and that the Check would be paid in Texas. Compass asserts, "[T]he face of the check together with UCC section 3.111 provide the 'place of payment,' i.e., where the contract between the putative drawer, M/I Title, LLC, and Zabel is to be performed."[3]

Texas Business and Commerce Code Section 3.111 provides that a negotiable instrument "is payable at the place of payment stated in the instrument. If no place

---

**3.** Texas's version of the UCC is codified in the Business and Commerce Code. *1/2 Price*

*Checks Cashed v. United Auto. Ins. Co.,* 344 S.W.3d 378, 380 n.1 (Tex. 2011).

of payment is stated, an instrument is payable at the address of the drawee [Compass] or maker [T/I Title] stated in the instrument." Tex. Bus. Comm. Code Ann. § 3.111 (West 2002). Because T/I Title's Texas address is stated on the Check, Compass asserts, "as a matter of law, the contract [i.e., the Check] is performable in Texas[.]" Compass avers, "Zabel is a law firm and, one assumes, is aware of the law with regard to a check or draft under the UCC, including the 'place of payment.'"[4] Compass claims, "With knowledge of the law [section 3.111] and the information on the face of the check, Zabel ... intentionally elected to indorse, negotiate, and deposit the check for payment in Texas." But purposeful availment involves contacts that the defendant purposefully directed into the forum state. *Searcy*, 496 S.W.3d at 67. Personal jurisdictional analysis "always centers on the defendant's actions and choices to enter the forum state and conduct business." *Kelly*, 301 S.W.3d at 660.

Section 3.111 is a substantive law that concerns the payment of negotiable instruments. It is part of UCC Article 3, which "establishes a comprehensive scheme governing the procedures, liabilities, and remedies pertaining to negotiable instruments." *1/2 Price Checks Cashed*, 344 S.W.3d at 380. It is not a substitute for jurisdictional facts needed to show that a defendant's contacts were purposefully directed at Texas. *See Cerbone v. Farb*, 225 S.W.3d 764, 769 (Tex. App.— Houston [14th Dist.] 2007, no pet.) (noting that trial court lacked personal jurisdiction; issue presented was not whether maker was liable for promissory note under Texas Business & Commerce Code but whether Illinois maker's signature on note was "sufficiently purposeful contact to justify the exercise of jurisdiction.").

. Compass also relies on additional UCC provisions to establish specific personal jurisdiction over Zabel. Compass argues that, under the terms of these provisions, Zabel made statutory presentment and transfer warranties to Compass in Texas when Zabel indorsed the Check and deposited it in its own bank in Illinois. *See* Tex. Bus. Comm. Code Ann. §§ 3.416, 3.417, 4.207, 4.208 (West Supp. 2016). Compass relies on Section 3.416, which provides, "A person who transfers an instrument for consideration warrants to the transferee and, if the transfer is by indorsement, to any subsequent transferee that ... (1) the warrantor is a person entitled to enforce the instrument; [and] (2) all signatures on the instrument are authentic and authorized...." *Id.* at § 3.416. And it points to Section 3.417, which states that, at the time of presentment, the person obtaining payment or acceptance of a draft, and a previous transferor of the draft, warrant (1) the warrantor is entitled to enforce the draft or obtain payment on behalf of the person entitled to enforce it; (2) the draft has not been altered; and (3) the warrantor "has no knowledge that the signature of the drawer of the draft is unauthorized." *Id.* § 3.417. Because the Check was a counterfeit, Compass claims that Zabel also breached the statutory warranties in Texas when the Check was presented for payment to Compass.

We agree with Zabel that the alleged statutory warranties do not provide personal jurisdiction over it. The statutory warranty provisions concern issues of substantive law, not jurisdictional issues. Statutory liability does not equate to, and is not a substitute for, the due-process requirement that a defendant must purposefully direct its conduct into a forum state.

---

4. Sanchez testified in his deposition, "I am not a UCC attorney." He testified that Zabel

practices primarily in the areas of tax and real estate law.

See Kelly, 301 S.W.3d at 660 ("A state is powerless to create jurisdiction over a nonresident by establishing a remedy for a private wrong and a mechanism to seek that relief. Instead, jurisdictional analysis always centers on the *defendant's* actions and choices to enter the forum state and conduct business."). Accepting Compass's argument would improperly shift the focus from the relationship between the defendant, the forum, and the litigation to the relationship among the plaintiff, the forum, and the litigation. See Michiana Easy Livin' Country, 168 S.W.3d at 790 (holding that directing a tort at Texas does not establish specific personal jurisdiction because it focus on relationship between plaintiff, forum, and litigation rather than defendant, forum, and litigation).

Finally, Compass appears to assert that Zabel is liable because it did not conduct due diligence to ensure that the check was not a counterfeit. In the trial court, Compass offered bar journal articles from Illinois that discuss scams similar to that perpetrated in this case. Compass intimates that Zabel should have been aware of such scams. And Compass alleges that Zabel "missed or ignored an array of red flags" with respect to the Check. Compass asserts that Zabel should have contacted T/I Title to inquire about the Check's validity or should have insisted that the transfer of funds be structured differently. However, all of these alleged acts and omissions occurred in Illinois and cannot serve as the basis for personal jurisdiction in Texas.

Based on the record, we conclude that Zabel did not purposefully avail itself of the privilege of conducting activities in Texas, thus, it does not have the requisite minimum contacts with Texas to be subject to specific personal jurisdiction in this fo-rum. We hold that the trial court erred when it denied Zabel's special appearance.

We sustain Zabel's sole issue.

### Conclusion

We reverse the trial court's order and render judgment dismissing Compass's claims against Zabel for lack of personal jurisdiction.