**Opinion issued February 19, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00435-CV

———————————

**CHARLES AUSTIN, Appellant**

**V.**

**EXTRUDED ALUMINUM CORP., Appellee**

---

**On Appeal from the 458th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 23-DCV-309088**

---

## O P I N I O N

Appellant Charles Austin alleges that he was in the parking lot at a solar farm in Needville, Texas when Eric Padilla ran over him with a vehicle. Austin says that Padilla should have been told to back into the parking space, as

opposed to parking front end first. Austin brought this suit against Padilla and ten other defendants:

- Austin's own employer—PeopleReady

- Padilla's employer—Onin Staffing

- The solar power company and premises owner—Old 300 Solar Center

- A co-owner of the premises—Orsted Onshore North American

- The solar panel supplier—Array Tech

- A solar panel part maker—Extruded Aluminum Corp. (EAC)

- An onsite quality assurance and remediation provider—Stratosphere Quality

- A construction contractor—Blattner Energy

- An onsite safety consultant—Intuitive Safety Solutions

- A construction site manager—Bradley Construction Management

EAC, a Michigan company, filed a special appearance. EAC argues that its few contacts with Texas "have no relation to the operative facts of the litigation." EAC admits sending two people to Texas to work on defective parts, but it argues that this had nothing to do with the parking lot or policies about backing in. The trial court granted EAC's special appearance.

On appeal, Austin argues that the trial court erred in granting EAC's special appearance because EAC purposefully directed its activities toward Texas and his lawsuit arises from or relates to EAC's activities. We affirm.

2

## Background

The facts remain to be developed at trial. We therefore rely on the record as it exists so far, which we will summarize without intending to specify exactly what has been proven unless we indicate otherwise.

According to the live petition, Needville serves as home for a solar power farm on about 200 acres of land leased to Old 300 and Orsted. Another company involved in the project is Stratosphere. Stratosphere rented a bus that would transfer workers from the worksite to the parking lot at the end of their shift. One day, the bus got to the parking lot and stopped to let the workers get out, whereupon Padilla got into his vehicle and waited for the bus to move before he could back out of the parking space. As soon as the bus moved out of the way, he put his vehicle into reverse and ran over Austin.

This lawsuit followed. EAC filed a special appearance. It described this case as a simple "motor vehicle versus pedestrian incident which took place in Fort Bend County on June 25, 2021." It stated that EAC is a Michigan corporation with no agent for service of process in Texas. It also stated that EAC did not employ Padilla and that Austin "does not allege any other activity on Defendant's part which would subject it to jurisdiction in a Texas court."

Stratosphere asked for leave to designate several existing defendants as responsible third parties.[1] Although Stratosphere agreed with the other defendants that Austin should lose, it also argued that if he has a case, the fault should be spread around to include PeopleReady, Onin, ISS, Bradley, and EAC. The trial court agreed and designated those defendants as responsible third parties. Nobody discussed whether a party already in the case can be a responsible third party. *See In re CVR Energy, Inc.*, 500 S.W.3d 67, 78 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding [mand. denied]) (op. on reh'g) ("'[T]hird party' means a party that is not otherwise a party to the litigation.").

As evidence to support its special appearance, EAC submitted an affidavit from one of its managers, Joe Budde. His affidavit stated that he is a manager of quality systems at EAC, "an aluminum manufacturing company based in Michigan." EAC did not have any offices in Texas, nor did it have a registered agent in Texas. EAC did not market in Texas.

EAC manufactured aluminum brackets for Array, a solar rack system supplier based in New Mexico. Array and EAC had an ongoing relationship: Array had purchased products from EAC by purchase orders for several years.

---

[1] Stratosphere also filed a cross-claim against EAC based on an indemnity provision in its contract with EAC.

4

The particular aluminum brackets relevant to this case were "drop-shipped" to the Needville "Old 300 Solar Project." Blattner Energy, another defendant in the case, installed the brackets.

Budde explained that Array had contacted EAC to report a problem with the wax lubricants for some of the brackets. So EAC took action to assist its customer: "As part of an effort to resolve the issue, EAC contracted with Stratosphere Quality," a company headquartered in Indiana, to "staff employees to repair the brackets." Stratosphere subcontracted with PeopleReady and Onin "to hire local employees for the repairs."

Budde stated that "[t]he only time EAC employees were at the solar project was after EAC was informed of the defective brackets." EAC had no involvement in the safety policies at the site. Budde added that EAC "did not maintain or control the parking area where the incident occurred." Instead, "EAC solely provided the aluminum brackets and took steps to repair the brackets."

In reply, Austin took the position that EAC had certainly sent two employees to Texas, that these employees underwent safety training at the solar farm site relating to the need to back into parking spaces, and that they had not ensured that the backing up policy was passed on to Stratosphere,

5

PeopleReady, Onin, or Padilla, who "ran over and catastrophically injured [Austin] while backing up his car in the worksite parking lot."

At a pretrial hearing in January 2024, the trial court raised questions about the nexus between EAC's defective brackets and the car accident, asking, "[W]hat were these brackets doing? I'm still not understanding the relationship between the brackets and the car." The court also questioned which defendant had created the backing up policy. The court did not resolve those questions at that time but instead ordered the parties to conduct jurisdictional discovery by deposing Budde.

When the special appearance hearing resumed a few months later, the parties focused more sharply on the jurisdictional analysis. EAC urged that its contacts with Texas would not support jurisdiction, while Austin argued that EAC "is the only entity so far in this case that has, in fact, undergone the safety orientation with the policies that would have prevented this incident all together." The trial court granted EAC's special appearance. Austin appealed.

**Personal Jurisdiction**

In his sole complaint on appeal, Austin contends that the trial court erred in granting EAC's special appearance. Stratosphere has submitted an amicus brief agreeing with Austin that the ruling should be reversed. Stratosphere does not necessarily agree with Austin that this lawsuit has any merit; but if the case

6

goes to trial, Stratosphere would welcome EAC's company on the defense side of the courtroom.

**A.     Standard of Review**

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *See BRP-Rotax GmbH & Co. KG v. Shaik*, 716 S.W.3d 98, 103 (Tex. 2025). When, as here, the trial court did not issue findings of fact and conclusions of law, we imply all relevant facts that are necessary to support the judgment and supported by evidence. *See Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). If the parties present conflicting evidence that raises a fact issue, we resolve the dispute by upholding the trial court's determination. *See State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 413 (Tex. 2023) (quotation omitted).

**B.     Governing Law**

A court must have personal jurisdiction over a defendant to issue a binding judgment. *BRP-Rotax*, 716 S.W.3d at 103 (quoting *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023)). Texas courts may exercise personal jurisdiction over a nonresident defendant if such exercise is (1) authorized by the Texas long-arm statute and (2) consistent with federal due process guarantees. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 17.042

(listing examples of when nonresident does business in Texas). Allegations that a defendant committed a tort in Texas satisfy the long-arm statute, but these allegations must also satisfy due process requirements. *BRP-Rotax*, 716 S.W.3d at 104. Exercise of personal jurisdiction is proper when the nonresident defendant has "certain minimum contacts" with Texas such that maintenance of the suit against it here does not offend "traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

There are two kinds of personal jurisdiction, general and specific jurisdiction, and only specific jurisdiction is at issue in this case. *See id.* For a court to exercise specific jurisdiction, the defendant must have taken some act by which it purposefully avails itself of conducting activities in Texas, invoking the benefits and protections of the laws of this state. *Id.* Additionally, the claims asserted against the defendant must "arise out of or relate to" the defendant's "Texas-focused activities." *Id.* (quotation omitted). We focus on the nature and extent of the defendant's relationship to Texas. *LG Chem Am.*, 670 S.W.3d at 346 (quotation omitted); *see Volkswagen*, 669 S.W.3d at 413 (stating that specific jurisdiction "involves a 'claim-by-claim' analysis that focuses on the relationship between the defendant, the forum state, and the operative facts of the litigation").

Even if the defendant has minimum contacts with Texas, the exercise of personal jurisdiction must comply with traditional notions of fair play and substantial justice. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 18 (Tex. 2021). We consider the defendant's contacts in light of five factors when making this evaluation: (1) the burden on the defendant; (2) the interests of Texas in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies. *Id.* at 18–19. Only in "rare cases" will the exercise of jurisdiction not comport with traditional notions of fair play and substantial justice when the defendant has minimum contacts with Texas. *Id.* at 18 (quotation omitted).

The plaintiff bears the initial burden to plead sufficient allegations bringing the nonresident defendant within the reach of the long-arm statute. *LG Chem Am.*, 670 S.W.3d at 346. The defendant then bears the burden of negating all bases for personal jurisdiction alleged, which it may do on either a factual or legal basis. *Id.*

## C. Purposeful Availment

Analysis for purposeful availment has three dimensions. First, courts look at the defendant's contacts with the forum, as opposed to someone else's

9

contacts. *BRP-Rotax*, 716 S.W.3d at 104 ("[T]he jurisdictionally relevant activities must have been the defendant's own choice . . . .") (quotation omitted). Second, the acts relied on must be purposeful, as opposed to being random, isolated, or fortuitous. *Id.* Third, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013) (quotation omitted). This inquiry focuses on "whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there." *Volkswagen*, 669 S.W.3d at 413 (quotation omitted). We consider "the quality and nature" of the defendant's contacts with Texas, "not the quantity." *Id.* at 414 (quotation omitted); *see Moncrief Oil*, 414 S.W.3d at 151 ("A substantial connection can result from even a single act.").

Regarding purposeful availment by EAC, Austin argues that EAC shipped the component parts directly to Needville, Texas; contracted with Stratosphere to hire laborers to do the remediation work; and sent two managers to Texas to supervise the entire repair process. It characterizes these activities as intentional and not accidental. Austin's brief supports these assertions with citations to the record, although without any discussion of supporting cases.

On the other hand, supporting caselaw does appear in the Stratosphere amicus brief, which discusses several cases about purposeful availment and conduct such as repair or installation. *See Glob. Energy Sols., LLC v. Kermit Pipeline, LLC*, 657 S.W.3d 165 (Tex. App.—El Paso 2022, no pet.); *H. Heller & Co. v. La.-Pac. Corp.*, 209 S.W.3d 844 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *GJP, Inc. v. Ghosh*, 251 S.W.3d 854 (Tex. App.—Austin 2008, no pet.); *Ball v. Bigham*, 990 S.W.2d 343 (Tex. App.—Amarillo 1999, no pet.); *see also Nawracaj v. Genesys Software Sys., Inc.*, 524 S.W.3d 746, 754–55 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding that nonresident attorney who was admitted *pro hac vice* to federal court in Texas, handled "over 90% of the work in the litigation," recruited Texas law firm to serve as local counsel, and supervised that firm's work purposefully availed himself of privilege of conducting business in Texas).

For example, in *Ball v. Bigham*, a nonresident defendant sold an engine to a buyer in Texas. After problems surfaced and required repair work, the defendant "Bigham traveled from Kansas to the farm in Texas and repaired the engine." 990 S.W.2d at 345. The trial court found no purposeful availment, because the defendant traveled to Texas only twice, "to deliver, and later to repair, the engine." *Id.* at 348. But the appellate court disagreed and found purposeful availment, reasoning that the defendant "knew he was obligated to

11

deliver the engine and assist in its installation in Texas at the time he accepted [the buyer's] payment" and therefore the defendant "was bound to partially perform the contract in Texas and his contacts with Texas in this regard were purposeful." *Id.* The court further concluded that the defendant's "trip to Texas and conduct in Texas was in fulfillment of his obligation under the agreement" and was not fortuitous. *Id.* at 349.

*Global Energy Solutions* reached a similar result. This time the nonresident defendant sold and shipped an industrial water pump for use in Texas. 657 S.W.3d at 170. When the pump failed, the defendant seller sent an employee to Texas to investigate and perhaps repair the pump. *Id.* at 171. The appellate court found purposeful availment. The seller "understood the pump was to be permanently used at a particular location in Texas." *Id*. at 176. It "arranged for the shipping with a delivery point within Texas." *Id.* It also arranged for someone "to come to Texas to attempt a repair of the pump." *Id.* The appellate court, citing *Ball* and similar cases, held that the seller had "purposefully availed itself of the forum, such that it could have reasonably anticipated being hailed into a Texas court because of its activities." *Id.* at 177. These authorities support Austin's position that EAC's contacts with Texas constituted purposeful availment.

EAC argues that it did not purposefully avail itself of the privilege of conducting business in Texas, pointing to evidence that it did not have an office in Texas, it did not have a registered agent in Texas, and it did not market its products in Texas. EAC argues that it did not intend to serve the Texas market and that its brackets only ended up in Texas because its customer Array, a New Mexico company,[2] requested that EAC ship the brackets to the solar farm in Needville. EAC also argues that it did not initially install the brackets: Blattner Energy did.

EAC acknowledges that once a problem arose with the brackets, it contracted with Stratosphere to coordinate the remediation work. Stratosphere subcontracted with two other companies to provide the labor for the remediation. It argues that although it "sent two employees to the site as a gesture of good faith and follow-up for its customer, and to show workers how to properly remediate the brackets," its physical presence in Texas alone does not constitute purposeful availment. Moreover, EAC's contract with

---

[2] EAC cites a decision from this Court, *Jay Zabel & Associates, Ltd. v. Compass Bank*, for the proposition that merely contracting with a Texas resident does not satisfy the minimum contacts requirement, nor does the single fact that a contract is payable in Texas justify the exercise of personal jurisdiction. *See* 527 S.W.3d 545, 554 (Tex. App.—Houston [1st Dist.] 2017, no pet.). It points out that it did not contract with a Texas resident: Array is a New Mexico company. We further point out that the other entity with which EAC contracted, Stratosphere, is headquartered in Indiana according to Budde's affidavit submitted with EAC's special appearance.

13

Stratosphere included an Indiana forum-selection clause and provided that it would be governed by Indiana law. Citing the Texas Supreme Court's decision in *Michiana Easy Livin' Country, Inc. v. Holten* as support, EAC argues that "[a] plain reading of the contract confirms no local availment was intended."[3]

In reply, Austin argues that once the brackets failed, EAC formed numerous purposeful contacts with Texas. Because additional workers were needed to fix the allegedly defective brackets, EAC contracted with—and agreed to pay—Stratosphere to provide the additional labor, which it did by subcontracting with companies to hire local Texas laborers. EAC therefore "had a purposeful and financial stake in the Texas market and benefitted from the use of Texas day-laborers to ensure the 'quality' of its products." EAC also had employees on-site at the solar farm during the remediation to "train, instruct, lead, and ensure the remediation project was completed successfully." EAC participated in status calls with other defendants during the remediation, and its employees "received safety training regarding the policies and

---

[3]    In *Michiana*, the Texas Supreme Court stated that choice-of-law provisions and forum-selection clauses "cannot be ignored" in the purposeful availment analysis. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792–93 (Tex. 2005). Although a forum-selection clause "operates as consent to jurisdiction in one forum, [and] not proof that the Constitution would allow no other," deletion of a forum-selection clause designating a foreign forum "is some evidence that local jurisdiction was anticipated" and "insertion of a clause designating a foreign forum suggests that no local availment was intended." *Id.* at 792.

procedures for the solar farm premises."[4] Additionally, the contract between EAC and Stratosphere contained an indemnity clause requiring EAC to indemnify Stratosphere "from and against all claims, suits, actions, damages, losses and expenses . . . arising from or relating to work performed by Stratosphere Quality, its employees, agents, and/or subcontractors under the terms of this Agreement."

We conclude that EAC purposefully availed itself of the privileges of conducting activities in Texas. EAC's contacts with Texas go beyond its products ending up in Texas due to the request of its New Mexico customer Array. Instead, once the brackets failed, EAC agreed to remediate the brackets, contracted with Stratosphere to provide labor for completing the repairs, and sent two employees to Texas to train the local laborers and supervise the repairs. EAC thus "recognized some continuing obligations to make good on its sale and delivery" of the brackets to Texas and "engaged in deliberate activities that created continuing obligations with residents of the forum." *See Glob. Energy Sols.*, 657 S.W.3d at 176–77 (quotation omitted); *Ball*, 990 S.W.2d at 349.

---

[4] Austin argues that EAC's assertion that it played no role in developing the safety policies for the solar farm "has no bearing on the minimum contacts analysis" but instead relates to EAC's ultimate liability, a merits issue.

We now turn to whether the litigation is related to EAC's contacts with Texas.

## D.    Relatedness

For specific jurisdiction to exist, the plaintiff's claims must arise out of or relate to the defendant's contacts with the forum. *BRP-Rotax*, 716 S.W.3d at 104 (quotation omitted); *see Old Republic*, 549 S.W.3d at 559 ("[S]pecific jurisdiction exists when the cause of action arises from or is related to a defendant's purposeful activities in the state."). "An 'affiliation' must exist 'between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum [s]tate and is therefore subject to the [s]tate's regulation.'" *Volkswagen*, 669 S.W.3d at 430 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017)); *Luciano*, 625 S.W.3d at 14 ("This so-called relatedness inquiry defines the appropriate nexus between the nonresident defendant, the litigation, and the forum.") (quotation omitted).

A plaintiff must demonstrate a substantial connection between the defendant's forum contacts and the operative facts of the litigation. *LG Chem. Am.*, 670 S.W.3d at 347 (quotation omitted). Proof of causation—"*i.e.*, proof that the plaintiff's claim came about *because of* the defendant's in-state conduct"—is not necessarily required. *Volkswagen*, 669 S.W.3d at 430–31

16

(quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)). Instead, "[r]elationships may 'support jurisdiction without a causal showing' even when the litigation merely relates to the defendant's forum contacts." *Id.* at 431 (quoting *Ford Motor Co.*, 592 U.S. at 362); *Luciano*, 625 S.W.3d at 16 (stating that United States Supreme Court "has confirmed that due process does not mandate a causation-only approach" to specific jurisdiction).

We evaluate relatedness on a claim-by-claim basis. *See TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (quotation omitted). Austin brings a claim for premises liability against EAC.

Paragraph 8.3 of Austin's live petition states the following: "At all times material to this suit, Defendants Orsted, Old 300, Bradley, Blattner, ISS, Array, and EAC owned, leased, managed, possessed, operated, and/or controlled the premises at the time of the subject incident." He continues:

> 8.4. A condition on Defendants' premises posed an unreasonable risk of harm. Specifically, Defendants' own policies and procedures pertaining to parking vehicles and spotting vehicles while in reverse were not being followed or implemented. Moreover, the complete lack of signage and other markings in the parking lot substantially contributed to the lack of order and safe traffic flow in the parking lot, which also caused or contributed to the cause of the subject incident.
>
> 8.5 Defendants knew or reasonably should have known of the dangerous conditions in or around the parking lot where the subject incident occurred.

17

8.6    Defendants had a duty to use ordinary care to ensure that the premises did not present a danger to Plaintiff Austin and other workers. This duty includes, among other things, the duty to:

1)    Require Padilla to park the vehicle correctly;[5]

2)    Enforce safety rules and regulations;

3)    Adhere to best practices in the industry;

4)    Provide direction to traffic on the premises;

5)    Provide adequate staff to direct traffic on the premises;

6)    Create and/or enforce safety rules and guidelines;

7)    Read, understand, follow and enforce safe work policies and procedures; and

8)    Properly hire, screen, train, control, or supervise employees in relation to overall parking lot safety.

8.7    Defendants' acts and omissions, whether taken singularly or in any combination, was a proximate cause of Plaintiff Austin's incident and resulting damages.

8.8    In the alternative, and without waiving the foregoing, a condition of the Defendants' premises posed an unreasonable risk of harm, and Defendants failed to conduct safety inspections and/or enact rules and regulations for the safety of Plaintiff and other workers in a reasonably prudent manner.

8.9    Defendants had a duty to inspect to discover defects/deficiencies and warn about such defects/deficiencies or make safe any dangerous condition the possessor knows of or should know of. This specifically includes, but is not limited to a duty to discover that the parking lot used by several workers at

---

[5]    In the factual recitation portion of his live pleading, Austin alleged that "Defendants Orsted, Old 300, Bradley, Blattner, ISS, Array, EAC, Stratosphere, Onin, and PeopleReady all failed in implementing such safety policies [concerning backing into parking spaces], as well as training workers like Padilla of such policies in the time leading up to the date of the subject incident."

the solar farm is not being managed by the backing and spotting safety rules promulgated by Defendants, as well as the duty to discover that the parking lot lacks any signage or markings that would direct the flow of traffic in a reasonable safe manner.[6]

While it may seem odd to assert a premises claim against an out-of-state supplier of a component part, that oddity presents a merits problem that need not be resolved today. What matters today is whether the claim against EAC arises from or relates to EAC's contacts with Texas.

The U.S. Supreme Court's *Ford* case addressed the difference between arising out of and relating to:

> None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. As just noted, our most common formulation of the rule demands that the suit "arise out of *or relate* to the defendant's contacts with the forum." The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum. But again, we have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct.

---

[6] Austin also asserts a gross negligence claim against "all defendants," alleging that "Defendants' acts and/or omissions, as previously described, were committed with complete and reckless disregard for, and with willful, wanton and actual conscious indifference to the rights, safety and welfare of Plaintiff and the general public."

*Ford Motor Co.*, 592 U.S. at 362 (internal citation omitted). American courts continue fleshing out the limits of relatedness under *Ford*,[7] but *Ford* has not prevented most Texas courts from applying their pre-*Ford* requirement of a "substantial connection" between the defendant's contacts and "the operative facts of the litigation." *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007) (describing "substantial connection" analysis); *see also, e.g.*, *LG Chem Am.*, 670 S.W.3d at 347 ("Under our precedents, the plaintiff must demonstrate a 'substantial connection' between the defendant's contacts and the operative facts of the litigation.") (quotation omitted); *Guillory v. Hallmark Specialty Ins. Co.*, No. 01-22-00081-CV, 2023 WL 5615474, at *11–13 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, no pet.) (mem. op.) (applying "substantial connection" analysis post-*Ford*).

Operative facts are the facts that "will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question." *Moki Mac*, 221 S.W.3d at 585; *Adams v. Tort Network, LLC*, No. 01-24-00169-CV, 2025 WL

---

[7]    Judge O'Scannlain has suggested that relatedness under *Ford* "requires a close connection between contacts and injury." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 506 (9th Cir. 2023); *see also Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1225 (10th Cir. 2021) ("*Ford* makes clear that specific jurisdiction is proper when a resident is injured by the very type of activity a nonresident directs at residents of the forum State—even if the activity that gave rise to the claim was not itself directed at the forum State.").

836631, at \*6 n.14 (Tex. App.—Houston [1st Dist.] Mar. 18, 2025, no pet.) (mem. op.); *Sarjak Container Lines Sing. PTE Ltd. v. Semons*, No. 01-21-00508-CV, 2023 WL 3235939, at \*8 (Tex. App.—Houston [1st Dist.] May 4, 2023, no pet.) (mem. op.).

If an EAC-contracted worker had injured Austin during the repairs by mishandling a drill or by dropping an anvil on his foot, EAC's Texas contacts and the Texas location of the repairs might well be dispositive.[8] But those are not the facts.

---

[8] *Compare Cessna Aircraft Co. v. Garcia*, No. 13-17-00259-CV, 2018 WL 6627602, at \*4 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2018, pet. denied) (mem. op.) ("[B]ecause the alleged defective crankshaft was marketed, sold, and installed in Texas, and Cessna's activities of selling its parts in Texas are related to the Family Members' claim that the defective crankshaft caused the accident, the trial court properly found that there is a substantial connection between Cessna's contacts and the operative facts of the litigation."), *with Blauer Mfg. Co. v. Stellar Restoration Servs., LLC*, No. 05-25-00174-CV, 2025 WL 1657251, at \*4 (Tex. App.—Dallas June 11, 2025, no pet.) (mem. op.) ("Stellar Restoration's claims relate to a contract between the parties for it to repair the roof at the Property. The Property, which includes the damaged roof, is located and insured in Mississippi. Stellar Restoration intended to perform its repair work in Mississippi as well. Because there is no substantial connection between Blauer's contacts with Texas and the operative facts of the litigation, specific jurisdiction does not exist . . . ."), *and Buckeye Aviation, L.L.C. v. Barrett Performance Aircraft, Inc.*, No. 09-10-00247-CV, 2011 WL 2420987, at \*6 (Tex. App.—Beaumont June 16, 2011, pet. denied) (mem. op.) ("Buckeye's claims stem primarily from defendants' repair of the engine. All inspections and repairs performed by defendants were performed in Oklahoma. To the extent Buckeye's claims concern defendants' sale and overhaul of the engine, the engine was originally located and remanufactured in Oklahoma. The operative facts alleged in support of Buckeye's claims all relate to conduct that allegedly took place in Oklahoma.").

EAC argues that the operative facts of this suit "principally concern the creation, implementation, and enforcement of the parking lot safety policy." Austin counters that this focus on the safety policy goes to the merits, not to the jurisdictional issue. As Austin points out, at this stage nobody can know for sure who deserves the most blame: "In fact, each of the corporate defendants blame someone else for not enforcing the policies . . . ."

Austin makes a valid point in highlighting the difference between jurisdiction and the merits. He does not have to prove his entire case to show jurisdiction. *See Old Republic*, 549 S.W.3d at 560 (cautioning that courts "must not confuse the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits") (quotation omitted); *Fuji Elec. Co. v. Perez*, 615 S.W.3d 508, 526 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("At this stage of litigation, Perez need not prove his claims, and we do not decide whether the evidence that has been presented to the trial court at this stage is sufficient to ultimately prove Perez's claims."). Even so, the link between EAC's Texas contacts and the operative facts still appears to be insubstantial. EAC sent two employees to Texas to assist with the defective components, but those components played no role in causing the harm. If the central facts at trial concern who knew and said what about how to park in the parking lot, those

22

facts seem only distantly connected to the solar panel components or EAC's contacts with Texas.

EAC's affidavit stated that EAC sent employees to perform repairs, but that EAC had nothing to do with the parking lot or any policy about having to back into spaces:

> 4.     During the initial installation of the brackets, Array notified EAC about defective brackets. *Please see* Exhibit C – Array Tech 8D Form. Specifically, the required wax lubricant for the brackets was diluted. As part of an effort to resolve the issue, EAC contracted with Stratosphere Quality, LLC ("Stratosphere"). *Please see* Exhibit D – Stratosphere Terms of Service Agreement. Stratosphere, a company headquartered in Indiana, was contracted to staff employees to repair the brackets. Ex. A and D. In turn, Stratosphere subcontracted with PeopleReady, Inc. ("PeopleReady") and Onin Staffing, LLC ("Onin") to hire local employees for the repairs. PeopleReady is headquartered in Washington, and Onin is headquartered in Alabama. Ex. A. Plaintiff, Charles Austin, was ultimately hired by PeopleReady. Defendant, Eric Padilla, was hired by Onin. Neither Charles Austin nor Eric Padilla was employed by EAC.

> 5.     The only time EAC employees were at the solar project was after EAC was informed of the defective brackets. EAC had no input in the creation, implementation, or enforcement of safety policies at the solar project. EAC further had no requirement to create, implement, or enforce safety policies for the solar project. Apart from the purchase orders from Array and its staffing contract with Stratosphere, EAC did not have a contractual relation with any other party in the current case. EAC also did not maintain or control the parking area where the incident occurred. Furthermore, EAC did not create a safety handbook or participate in safety orientations related to work on the project. EAC solely provided the aluminum brackets and took steps to repair the brackets.

During his deposition, Budde testified that he was aware that workers at the solar farm site had to go through a safety orientation training and the two EAC workers who traveled to Texas for the remediation did so. Budde did not know who required these employees to undergo safety training. EAC did not agree to provide its own safety policies or procedures for the solar farm site. Budde also testified that while *EAC* did not communicate any of the information in the safety orientation training to Stratosphere, he did not know whether anyone else communicated that information to Stratosphere.

We conclude that on this record, Austin did not establish a substantial connection between EAC's Texas contacts and the operative facts of the litigation. Although they are related in a philosophical sense, the relationship lacks the requisite closeness to meet the substantial connection test. *See Moncrief Oil*, 414 S.W.3d at 157 ("[B]ut-for causation alone is insufficient."); *Moki Mac*, 221 S.W.3d at 588 (concluding that while Moki Mac's promotional representations in Texas were "theoretically related" to plaintiff's injury and death on Arizona hiking trail "in the sense that but for them he might not have been there" on hiking trail, representations were not sufficiently related to operative facts underlying plaintiff's injury to justify exercise of specific personal jurisdiction); *Guillory*, 2023 WL 5615474, at *12 n.8 ("While the November 2020 Houston meeting is 'related to operative facts' because some

of Guillory's acts and omissions allegedly occurred during the meeting, this factor alone does not establish a substantial connection between Guillory's contacts and the malpractice claims against him because Guillory's contacts are neither 'the focus of the trial' on [the plaintiffs'] legal malpractice claims, nor will they 'consume most if not all of the litigation's attention.'"). We therefore hold that the trial court did not err by granting EAC's special appearance.

## Conclusion

We affirm the trial court's order granting EAC's special appearance.


David Gunn
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Caughey.

Justice Caughey, concurring.